The **UNIVERSITY OF COLORADO FOUNDATION, INC.**, a Colorado not-for-profit corporation, The University of Colorado, an institution of the State of Colorado, The Board of Regents of the University of Colorado, a body corporate of the State of Colorado, Robert H. Allen, an individual, and Paul A. Seligman, an individual, Plaintiffs,

v.

**AMERICAN CYANAMID**, a Maine corporation, Defendant.

Civ. A. No. 93–K–1657.

United States District Court, D. Colorado.

April 3, 1995.

Glenn K. Beaton, Beaton & Swanson, Robert N. Miller, LeBoeuf, Lamb, Greene & MacRae, Denver, CO, for plaintiffs.

Roger P. Thomasch, Mark A. Wielga, Ballard Spahr Andrews & Ingersoll, Denver, CO, Daniel J. Thomasch, Donovan, Leisure, Newton & Irvine, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

This action commenced in August 1993. On September 30, 1994, The University of Colorado Foundation, Inc. ("Foundation"), The University of Colorado ("University"), The Regents of the University of Colorado ("Regents"), Robert H. Allen and Paul A. Seligman (collectively "Plaintiffs") filed a Second Amended Complaint alleging that Defendant American Cyanamid Company ("Cyanamid") wrongfully filed and obtained a patent on a reformulated prescription prenatal vitamin called "Materna." Plaintiffs claims for relief are for (1) conversion, (2) fraud, (3) wrongful naming of inventor, (4) copyright infringement, (5) misappropriation, (6) patent infringement, (7) breach of confidentiality obligation, and (8) unjust enrichment.

Before me are (1) Plaintiffs' motion for partial summary judgment on their causes of action for conversion, fraud, and copyright infringement, (2) Cyanamid's motion for partial summary judgment on the copyright infringement claim, and (3) Cyanamid's motion for summary judgment on all causes of action. I grant Plaintiffs' motion in part and deny it in part; deny Cyanamid's partial summary judgment motion and grant Cyanamid's motion for summary judgment in part and deny it in part.

Jurisdiction obtains under 28 U.S.C. §§ 1331 and 1338(a) because Plaintiffs seek relief under the Patent Act, 35 U.S.C. § 256 and the Copyright Act, 17 U.S.C. §§ 101–810. Jurisdiction is also founded on 28 U.S.C. § 1332 in that this action is between citizens of different states and the matter in controversy exceeds $50,000.00, exclusive of interest and costs.

## I. *Background.*

Cyanamid began marketing its Materna multivitamin in the mid–1970's. In the late 1970's, a competitor of Cyanamid asserted that iron was not being sufficiently absorbed from Materna, due to interference from calcium carbonate which was present in Materna.

In late 1978 or early 1979, Dr. Leon Ellenbogen, a Cyanamid employee, agreed with Plaintiff Dr. Robert Allen, Director of Hematology and Professor of Biochemistry at the University of Colorado Health Sciences Center that Dr. Allen and Plaintiff Dr. Paul A. Seligman, a Professor of Medicine in the same division of hematology, would perform a study on patient volunteers to compare iron absorption from Materna with that from the competitor's product. Drs. Ellenbogen and Allen had known each other since the early 1970s and considered themselves trusted friends.

Although Dr. Ellenbogen had indicated he considered the existence of an iron absorption problem unlikely, he wanted to prove the competitor wrong. Drs. Allen and Seligman believed there might indeed be a problem. The fee for the study agreed upon between Dr. Ellenbogen on behalf of Cyanamid and Dr. Allen on behalf of the University was $5,000.00 for each of the compositions (Materna and the competitive product) for a total of $10,000.00.

In August 1979, the results of this study (Study I and Study IA) showed there was reduced absorption of iron from both Materna and the competitor's product.

On Dr. Allen's recommendation, Cyanamid engaged him to perform a further study to determine the extent of iron absorption from a composition containing only iron in the form of ferrous fumarate for the purpose of establishing a baseline for comparison with the results of the study on Materna and the competitive product. Cyanamid paid $5000.00 for that study. Drs. Allen and Seligman performed the study, the results of which validated the conclusions of the earlier study that iron absorption from both Materna and the competitive product was probably insufficient to meet the needs of pregnant women.

Drs. Allen and Seligman then conducted research, allegedly independent of Cyanamid, to establish the reason for the poor iron absorption from Materna and the competitive product. In particular, they devised and performed two new studies (Study II and Study IIA) in which they tested whether various combinations of calcium carbonate, calcium sulfate and magnesium oxide interfered with iron absorption. Study II pinpointed the reasons for the poor iron absorption and Study IIA confirmed how Materna could be reformulated to improve iron absorption. Plaintiffs maintain Dr. Allen sent Dr. Ellenbogen letters as a courtesy, explaining the results of these studies and including the new formulation.

Thereafter, Dr. Ellenbogen asked Drs. Allen and Seligman to conduct two further studies (Study III and Study IV) to measure the iron absorption from several competing products and that from two new formulated versions of Materna, including the Study IIA suggested reformulation. Cyanamid paid $5000.00 per composition for these studies which were performed in late 1980 and early 1981. The studies established Dr. Allen's suggested reformulation, having reduced calcium carbonate and magnesium oxide, showed improved iron absorption.

Cyanamid maintains Dr. Ellenbogen designed the protocol to be followed in the initial study and this was the standard upon which a series of subsequent studies, including Studies II and IIA, were based. Cyanamid contests Plaintiffs' claim that Cyanamid did not pay for Study IIA and states it paid $7,500 for the study, the first of two conducted in 1980.

Contrary to Plaintiffs' position, Cyanamid contends Dr. Ellenbogen conceived of the revised Materna product. Cyanamid cites the deposition testimony of Dr. Ellenbogen to the effect that a March 4, 1980 letter from Dr. Allen to Dr. Ellenbogen concerning a proposed reformulation was a confirmation of what Drs. Ellenbogen and Allen had previously discussed. Dr. Ellenbogen testified he believes the decision to reduce magnesium and calcium originated with him.

Cyanamid also relies on the testimony of Dr. Robert P. Raymond, counsel who prepared the patent application. Dr. Raymond testified that, in preparing the application in 1981, he relied on a memorandum prepared some time earlier by Dr. Ellenbogen. In Dr. Raymond's view the memorandum showed Dr. Ellenbogen conceived of the reformulation before the alleged March 1980 conception of Drs. Allen and Seligman. Neither Dr. Raymond nor Cyanamid can locate this memorandum. Dr. Raymond identifies it as one of the documents discarded in July 1993, before this action commenced, when Cyanamid's patent law department transferred from Connecticut to New Jersey. Plaintiffs dispute the existence of the memorandum.

In July, 1981, Drs. Allen and Seligman submitted a manuscript, authored by themselves and four of their assistants, entitled "Inadequate Iron Absorption From Many Prenatal Multivitamin–Mineral Supplements" to the *New England Journal of Medicine*. Dr. Allen sent Dr. Ellenbogen a courtesy copy of the manuscript in confidence. The Article described Studies I, IA, II, III and IV, the reformulated version of Materna having reduced levels of calcium carbonate and magnesium oxide, and the improved iron absorption. The *New England Journal of Medicine* rejected the manuscript.

In December 1981, Drs. Allen and Seligman resubmitted the manuscript, with certain changes, to a medical journal called *Obstetrics and Gynecology*. Again, Dr. Allen sent Dr. Ellenbogen a courtesy copy of the revised manuscript in confidence. The manuscript, while acknowledging Cyanamid had paid for certain studies, did not name Dr. Ellenbogen as a co-author. Dr. Ellenbogen did not object to this. The manuscript was published in the March 1983 volume of *Obstetrics and Gynecology* (the "Article").

In 1981 and 1982, after Cyanamid had adopted a reformulated version of Materna containing reduced amounts of calcium and magnesium oxide, Cyanamid issued various press releases and held a press conference with Dr. Allen describing the studies and the enhanced iron absorption from the reformulated version. Plaintiffs state at the press conference, in each of the press releases, in correspondence with the U.S. Food and Drug Administration, and in numerous internal memoranda, Cyanamid credited Dr. Allen with the discovery that the reason for poor absorption before the reformulation was interference by calcium carbonate and magnesium oxide.

Drs. Allen and Seligman, as employees of the University, were subject to its patent policy. Under this policy, inventions made by University employees using University facilities were to be assigned by the inventors to the University, subject to a royalty interest payable to the inventors personally. Any other assignment of such inventions could be made only by the University. The Foundation had a contractual relationship with the University for exploiting inventions of the University.

Plaintiffs claim the reformulation was invented by Drs. Allen and Seligman using University time and facilities and, therefore, under the University policy, Drs. Allen and Seligman were and are the equitable owners of the invention. Under the patent policy, Drs. Allen and Seligman were required to take certain measures to protect any claimed invention. Drs. Allen and Seligman did not take such measures in relation to the reformulation of the Materna multivitamin, alleg-

edly because they did not realize they had discovered a patentable invention.

According to Plaintiffs, shortly after receiving the courtesy copy of the manuscript of the Article, Dr. Ellenbogen contacted a Cyanamid in-house patent attorney to discuss patenting the invention. Cyanamid then prepared a patent application using information, drawings and a table from the Article.

On December 21, 1981, Cyanamid filed a patent application in its own name, naming Dr. Ellenbogen as the sole inventor and Cyanamid as assignee. The application covered the reformulated version of Materna which Dr. Allen had described in the results of Study IIA. Cyanamid has since enforced its patent monopoly to prevent competition by various generic drug manufacturers.

After the studies described above, Cyanamid, through Dr. Ellenbogen, contracted with Drs. Allen and Seligman from time to time to perform additional studies involving the Materna multivitamin and other iron-containing preparations for agreed upon fees. These studies continued until 1989. Cyanamid and the University entered into formal agreements governing the parties' rights to intellectual property other than the reformulated version of Materna.

Plaintiffs maintain Cyanamid did not directly tell Drs. Allen or Seligman or the University anything about the patent related to the studies which issued in 1984 ("Patent"). Cyanamid disputes this and claims there was widespread availability of public information relating to the Patent and that Cyanamid began marking the Patent on Materna labels shortly after it issued. Plaintiffs claim they finally learned of the Patent in the summer of 1993 and then filed this action.

## II. *Standards for Summary Judgment.*

Summary judgment is proper where the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In considering this motion, one must construe the factual record and reasonable inferences therefrom in the light most favorable to the non-moving party. *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 528 (10th Cir.1994). The mere allegation of a factual dispute will not defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The non-moving party must point to specific facts, "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves," to avoid summary judgment. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

## III. *Merits.*

### 1. *Conversion.*

■ Plaintiffs allege Cyanamid is liable for conversion by virtue of having "intentionally exercised dominion and control over Plaintiffs' invention by filing a patent application" and of having "wrongfully deprived Plaintiffs of Plaintiffs' right to control the invention by denying Plaintiffs the opportunity to license or otherwise exploit the invention." (Second Am. Compl. ¶¶ 54–55). Both Plaintiffs and Cyanamid maintain as a matter of law they are entitled to judgment on the conversion claim.

Under Colorado law "[c]onversion is defined as any distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another." *Glenn Arms Assocs. v. Century Mortgage & Inv. Corp.,* 680 P.2d 1315, 1317 (Colo.App.1984). "Although the act of conversion takes place at the time the converter takes dominion over the property, predicates to a successful claim for conversion are the owner's demand for the return of the property and the controlling party's refusal to return it." *Id.*

Plaintiffs preface their argument in support of the claim for conversion by stating that Drs. Allen and Seligman are the true inventors of the reformulated Materna because the reformulation was initially their conception. They cite *Burroughs Wellcome Co. v. Barr Laboratories,* 828 F.Supp. 1200, 1208 (E.D.N.C.1993), an action for patent infringement, where the court considered the

issue of inventorship of the drug AZT used in treating Human Immunodeficiency Virus ("HIV") which causes AIDS. The *Burroughs* court held "[t]he key to determining inventorship is conception. 'Unless a person contributes to conception of the invention, he is not an inventor.'" *Id.* (citations omitted).

Plaintiffs maintain Drs. Alan and Seligman had a conception of the reformulated Materna before any conception by Dr. Ellenbogen, and therefore they are the true inventors and owners of the invention which, they maintain Cyanamid converted. Plaintiffs distinguish between the "invention" which they define as "an idea" and the "[p]atent rights to it [which] are property rights." (*See* Pls.' Reply Br. Supp. Pls. Mot. Partial Summ.J. at 18.) Defendants argue there are no reported decisions extending conversion under Colorado law to "inventions or ideas in general." (Defs.' Memo Law Supp. Mot. Summ.J. at 27.)

Colorado courts have not defined the parameters of "personal property" within the definition of conversion. What may be converted is discussed by W. Page Keeton et al. in *Prosser and Keeton on the Law of Torts* § 15 at 90–92 (5th ed. 1984). The authors state initially the only property subject to conversion was a tangible chattel that could be lost and found. *Id.* at 90. The courts have subsequently relaxed this rule to allow conversion of intangible property rights in the following circumstances: (1) conversion of a document in which intangible rights are merged, e.g., a promissory note, check, bond, bill of lading or stock certificate; (2) conversion of a tangible object which was highly important to the exercise of an intangible right, e.g., a savings bank book, an insurance policy, a tax receipt, account books; (3) conversion of specific rights without an accompanying conversion of anything tangible, e.g. where a corporation refuses to register a transfer of the rights of a shareholder on its books. *Id.* at 90–91.

Plaintiffs maintain "[t]he cases uniformly allow conversion actions under the circumstances of the present case." (Pls.' Br. Opp. Mot. Summ.J. at 31.) However, in none of the cases cited by Plaintiffs, was a cause of action for conversion adjudicated.

Plaintiffs rely on *Richardson v. Suzuki Motor Co.,* 868 F.2d 1226 (Fed.Cir.), *cert. denied,* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989) in support of their claim. The plaintiff in *Richardson* did not, however, assert a conversion claim. There the court awarded relief based upon defendant's misappropriation of a trade secret developed by plaintiff pursuant to a formal Option and License Agreement ("Agreement") executed between the parties. The Federal Circuit reviewed inconsistent findings rendered by the jury after a forty-seven day trial and concluded that plaintiff had disclosed an invention pursuant to the Agreement and that defendant, in violation of its formal obligation of confidentiality, wrongfully obtained a patent on the invention, naming two of its employees as inventors. The Federal Circuit stated "[b]ased on the jury verdict, Richardson is entitled to ownership of the patents as against Suzuki." *Id.* at 1249.

Here, unlike in *Richardson,* Plaintiffs voluntarily disclosed the invention to Cyanamid and consented to Cyanamid's sale of the reformulated Materna product which, they claim embodies their invention. Plaintiffs cannot justify their conversion claim on the basis of *Richardson,* which not only concerned somewhat different facts, but did not involve a claim for conversion.

Plaintiffs reliance on other cases cited in *Richardson* in support of their conversion claim is similarly tenuous. Although in each of those cases the court ordered the assignment of patent rights, none concerned a cause of action for conversion. *See Colgate–Palmolive Co. v. Carter Products, Inc.,* 230 F.2d 855, 865 (4th Cir.), *cert. denied,* 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59 (1956) (assignment ordered due to misappropriation of a trade secret resulting "from the employment of one to whom it had been imparted in the course of a former employment"); *De Long Corp. v. Lucas,* 176 F.Supp. 104, 134 (S.D.N.Y.1959), *aff'd,* 278 F.2d 804 (2nd Cir.), *cert. denied,* 364 U.S. 833, 81 S.Ct. 71, 5 L.Ed.2d 58 (1960) (former employee's breach of no-competition clause and breach of covenant not to disclose trade secrets entitled former employer to assignment of patent rights); *Becher v. Contoure Labs., Inc.,* 279

U.S. 388, 391–92, 49 S.Ct. 356, 357–58, 73 L.Ed. 752 (1929) (assignment of patent ordered where employee filed patent application on invention of former employer after agreeing to keep secret information rendered to him by the employer); *Saco–Lowell Shops v. Reynolds,* 141 F.2d 587, 598 (4th Cir.1944) (requiring assignment of patent based on ideas received by licensor from licensee in confidence during the development of an invention).

Plaintiffs also rely on *Stark v. Advanced Magnetics, Inc.,* 29 F.3d 1570, 1578 (Fed.Cir. 1994). There, an alleged inventor brought an action requesting correction of inventorship of six patents assigned to the corporation and asserted related state law claims, including a claim for conversion. The district court granted summary judgment to the corporation with respect to correction of inventorship and dismissed the state law tort claims as barred by the three year statute of limitations. The Federal Circuit vacated the summary judgment as to the patent counts. It also vacated the dismissal of the state law tort claim because certain "complexities of facts and law were not explored by the district court" on the statute of limitations issue. Thus, neither the district court nor the Federal Circuit addressed the merits of any of the tort claims, including the cause of action for conversion.

Cyanamid cites *Liebowitz v. Maxwell,* 32 U.S.P.Q.2d 1683, 1686, 1994 WL 517456 (S.D.N.Y.1994) where the court dismissed plaintiff's claim for conversion of a trademark on the grounds that the kinds of intangible property for which actions of conversion had been recognized in Maryland were rights which had been incorporated in documents which were then converted, e.g., stocks and insurance policies. "Since defendants have not withheld anything tangible and even under Maryland's 'liberal' definition of conversion 'the initial focus continues to be on the tangible item withheld' plaintiffs' claim for conversion cannot stand." *Id.* (citation omitted).

Cyanamid also cites as persuasive authority *Miles, Inc. v. Scripps Clinic & Research Foundation,* 810 F.Supp. 1091, 1096 (S.D.Cal.1993). There the court refused to extend the law of California to permit a claim for conversion of a right to commercialize a "cell line," even though a cell line may be patented. The court noted "it is not uncommon for a person to have an intangible property right without a cause of action in conversion to protect that right." *Id.*

In *Mackay v. Benjamin Franklin Realty & Holding Co.,* 288 Pa. 207, 135 A. 613, 614 (1927), the court held that an action for conversion was not maintainable against a builder whose architect used another architect's ideas but never had possession of his plans. "We are aware that an action of trover and conversion can be maintained for almost any kind of personalty, including money, notes, bonds, certificates of stock, title deeds, etc., but no authority was cited and we know of none where such action has been sustained for something so intangible as an idea, not connected with physical property." *Id.*

In *Thompson v. Mobil Producing Co.,* the court held "[p]ersonal property is the subject of conversion 'if of a tangible nature, or if it is tangible evidence of title to intangible or real property.'" 163 F.Supp. 402, 404 (D.Mont.1958) (citing 89 C.J.S. *Trover & Conversion* §§ 11 and 12 and cases there cited). The court concluded that confidential oil information with respect to options to lease land was "not property which could be the subject of an action in conversion." *Id.*

Here, Plaintiffs do not claim any document confers an intangible right and that there has been conversion of such document amounting to conversion of the right. Therefore the alleged conversion does not fall within the first two categories mentioned in W. Page Keeton et al., *supra* § 15 at 91. Plaintiffs appear to argue that the third type of intangible property conversion applies, i.e. that there has been a conversion of rights without the accompanying of something tangible. Courts have, however, limited this third category to where a corporation refuses to register a transfer of rights of a shareholder on its books. *See* W. Page Keeton et al., *supra* § 15 at 91 n. 30 and cases cited therein; *see also Calabrese Found., Inc. v. Investment Advisors Inc.,* 831 F.Supp. 1507, 1515 (D.Colo.1993) (applying Minnesota law, the

court refused to extend the third category to the unauthorized transfer of funds).

The Colorado Supreme Court addressed a claim relating to conversion of an intangible right in *McLaughlin v. Clementi*, 144 Colo. 34, 355 P.2d 100, 104 (1960). The court held an order directing repossession of a permit without foreclosure or execution was a nullity and the seller's exercise of dominion over the permit amounted to conversion. The facts of *McLaughlin* bring it within the category of conversion of a document amounting to the conversion of an intangible right. I find no Colorado case recognizing conversion of an intangible right unaccompanied by a document evidencing title to that right.

After reviewing the authorities, W. Page Keeton et al. conclude that "[t]he process of expansion [of traditional conversion law] has stopped with the kind of intangible rights which are customarily merged in, or identified with some document." *Supra* § 15 at 92. Plaintiffs cite no authority, nor do I find any authority which leads me to conclude that the Colorado Supreme Court would recognize a cause of action for conversion in the circumstances of this case. I therefore conclude Cyanamid is entitled to judgment as a matter of law on Plaintiffs' first cause of action for conversion.

### 2. *Fraud.*

█ Plaintiffs allege Cyanamid is liable for fraud because it "had an on-going duty to disclose to Dr. Allen the filing of the patent application related to the studies conducted by Dr. Allen, as a result of the continuing relationship of trust between Dr. Allen and Dr. Ellenbogen and as a result of the obligation of good faith and fair dealing arising out of the on-going contractual relationship between the parties, before, during and after the studies." (Second Am.Compl. ¶ 59.) They maintain Cyanamid failed to disclose to Plaintiffs that it "intended to and did file a patent application on the reformulated version of Materna invented by Drs. Allen and Seligman," (*id.* ¶ 60,) intending that "Plaintiffs would not demand their rights to the patent or object to the copying of portions of the Article" (*id.* ¶ 61). Plaintiffs contend they justifiably relied on Cyanamid's afore-

said failure to disclose and "were thereby damaged by the deprivation of the right to license and otherwise exploit the patent." (*Id.* ¶ 63.) Plaintiffs and Cyanamid seek summary judgment on the fraud claim.

Restating the *Colorado Jury Instructions,* the pertinent elements of fraud by non-disclosure are:

(a) the defendant failed to disclose a past or present fact which it had a duty to disclose;

(b) the fact was material;

(c) the defendant failed to disclose the fact with the intent that the plaintiff take a course of action it might not take if it knew the actual facts;

(d) the plaintiff took such action or decided not to act relying on the assumption that the undisclosed fact did not exist or was different from what it actually was;

(e) the plaintiff's reliance was justified; and

(f) this reliance caused damage to the plaintiff.

*C.J.I.—Civ.3d,* § 19:2 and cases cited therein, especially *Kopeikin v. Merchants Mortgage & Trust Corp.,* 679 P.2d 599, 601 (Colo. 1984) (confirming *Morrison v. Godspeed,* 100 Colo. 470, 68 P.2d 458, 462 (1937) as the leading case setting out the elements of fraudulent concealment or non-disclosure); *Ackmann v. Merchants Mortgage & Trust Corp.,* 645 P.2d 7, 13 n. 3 (Colo.1982) ("[t]he statement of the elements of fraud by concealment in the Colorado Jury Instructions is substantially similar to the articulation of those elements contained in our case law").

Whether Cyanamid had a duty to disclose its intention to and filing of the Patent application depends on who was the inventor of the reformulated version of Materna patented. If Drs. Allen and Seligman invented the reformulation, it would seem conscionable for Cyanamid to have advised them of its intention to file for the Patent; if not, there does not seem to be a basis for such duty.

Plaintiffs allege, and argue in affidavit, that they are the inventors of the reformulation and therefore justifiably assumed Cyanamid would inform them of its patentability. Cyanamid, on the other hand, argues, relying

on the deposition testimony of Drs. Ellenbogen and Ray, that Dr. Ellenbogen conceived of the reformulation and was responsible for the protocol on which the relevant studies were based.

Because the material facts regarding inventorship are sufficiently disputed, I am unable to determine whether the elements of fraud by non-disclosure are satisfied. As I have noted, "[o]n a summary judgment motion, no margin exists for the disposition of factual issues, nor does such a motion serve as a substitute for trial when there are disputed facts." *Wilbourn v. Mostek Corp.*, 537 Fed.Supp. 302, 306 (D.Colo.1982). In these circumstances, it is inappropriate to grant summary judgment on the fraud cause of action.

### 3. *Wrongful Naming of Inventor and Patent Infringement.*

Cyanamid seeks summary judgment on Plaintiffs' third claim for wrongful naming of inventor and sixth claim for patent infringement. I address these claims together as both are premised on breaches of the Patent Act, 35 U.S.C. §§ 1–376.

Plaintiffs claim "Cyanamid's actions are in violation of Section 115 of the Patent Act, 35 U.S.C. § 115, which requires that the true inventors be named on a patent application." (Second Am.Compl. ¶ 65.) They maintain that they are the "equitable owners of Cyanamid's patent," (*id.* ¶ 75), and "Cyanamid's manufacture and sales of the Materna multivitamin incorporating the invention of Drs. Allen and Seligman, without authorization from Plaintiffs, constitute willful infringement of Plaintiffs' equitable patent rights," (*id.* ¶ 76). On the basis of the alleged patent infringement, Plaintiffs seek, *inter alia,* damages and "[a]n order revising the name of the inventor on the patent to name only the true inventors, namely Drs. Allen and Seligman," (*id.* at 20).

#### a. *Patent Infringement.*

■ Cyanamid argues, even if plaintiffs were able to establish equitable rights to the Patent, those rights would not form a valid basis for Plaintiffs' sixth claim for relief because "[l]egal, not equitable, ownership in a patent is necessary for standing to maintain an action for damages based on a claim of patent infringement." (Def.'s Memo Law Support Mot. Summ.J. at 19.) Cyanamid maintains, since Plaintiffs cannot claim legal ownership of the Patent, they do not have standing to recover money damages under the Patent Act.

Cyanamid relies on *Arachnid, Inc. v. Merit Industries, Inc.,* where the court held: "The general rule is that one seeking to recover money damages for infringement of a United States patent (an action 'at law') must have held the legal title to the patent during the time of the infringement." 939 F.2d 1574, 1578, 1579 (Fed.Cir.1991). The persons holding such legal title are "'the patentee, his assignee, his grantee, or his personal representatives; and *none but these* are able to maintain an action for infringement in a court of law.'" *Id.* (citing *Crown Die & Tool Co. v. Nye Tool & Mach. Works,* 261 U.S. 24, 40–41, 43 S.Ct. 254, 258, 67 L.Ed. 516 (1923)).

*Arachnid* concerned an ownership dispute over a patent that was issued to a consulting company (IDEA) whose employees invented a novel type of coin-operated electronic dart game. Kidde Recreation Products, Inc., not a party to the litigation, later purchased the patent which was then assigned to it. Plaintiff Arachnid obtained assignment of the patent against IDEA after it established IDEA employees had conceived of the invention during the course of a contractual relationship between Arachnid and IDEA. Pursuant to the contract, all inventions made by IDEA or its employees during the contract period, belonged to Arachnid. Arachnid sued Merit for alleged acts of patent infringement which occurred after the issuance of the patent to IDEA and before the court ordered assignment to Arachnid.

The Federal Circuit rejected Arachnid's "'Back–to–the–Future' theory" that it had always been the owner of the patented invention and therefore had standing to sue for infringement occurring before it became the patent's legal owner. *Arachnid,* 939 F.2d at 1579. The court held that, pre-assignment, Arachnid could only assert equitable, not legal title to the patent and, accordingly, could

not maintain an action at law for damages for infringement of patent.

Plaintiffs argue they seek an assignment of the patent, effective as of the date the patent issued, and an order establishing Cyanamid's holding of the Patent as constructive trustee for their benefit. They assert the assignment should include the right to sue for past infringement to protect their interests in their patent held in trust by Cyanamid.

Plaintiffs attempt to distinguish *Arachnid* "factually and equitably from the present case." (Pls.' Br. Opp. Def.'s Mot. Summ.J. at 62.) There, the inventor was contractually obligated to assign the patent to plaintiff Arachnid, but did not do so. The defendant, a third party, had in good faith obtained a license to the patent from the inventor's company, IDEA. Therefore, Arachnid never held legal title, but only equitable title in the form of the right to receive an assignment during the time of the third party's infringement.

Plaintiffs argue under the Patent Act they were always the "true owners of the Patent rights," (*id.*), because, as the inventors, Drs. Allen and Seligman initially owned the patent and legal title could not be conveyed absent an assignment. Plaintiffs maintain "[t]he fact that Cyanamid applied its own name to the Patent does not give it legal title; the only way to obtain legal title is to be the inventor or to receive a valid assignment from the inventor." (*Id.* at 63.)

Plaintiffs have not overcome the clear statement in *Arachnid* that:

A patent is a creature of statute, as is the right of the patentee to have a remedy for infringement of his patent. Suit must be brought on the *patent*, as ownership only of the invention gives no right to exclude, which is obtained only from the patent grant. In order to exercise that right, a plaintiff must necessarily have standing as comprehended by the patent statute.

*Arachnid*, 939 F.2d at 1578–79 (footnotes omitted).

■ Based on *Arachnid*, Plaintiffs cannot succeed in a claim for damages under the Patent Act since they do not have legal title as contemplated by the Act. Nevertheless,

Plaintiffs seek not only damages but equitable remedies. These include the profits on the sale of Materna since the patent was issued, an order establishing Cyanamid as constructive trustee of its profits on the sale of Materna since the date the patent was issued, an order establishing Plaintiffs as the owners of right, title and interest to the patent as of the date of issuance of the patent and an order revising the name of the inventor on the patent. (Second Am.Compl. at 19–20.).

As the court acknowledged in *Arachnid*, "a federal district court has jurisdiction to determine a 'claim for infringement,' asserted by an adjudged equitable title holder, as a prerequisite to awarding *equitable* relief for that infringement." *Arachnid*, 939 F.2d at 1580. Here, unlike in *Arachnid*, Plaintiffs seek not only money damages, a remedy at law, but also equitable remedies.

Cyanamid has not shown, as a matter of law that Plaintiffs cannot establish themselves as equitable title holders of the patent entitled to equitable relief. Therefore, there is no basis for granting summary judgment as requested by Cyanamid on the sixth claim for relief of patent infringement.

### b. *Wrongful Naming of Inventor.*

■ Plaintiffs claim the naming of Dr. Ellenbogen as the inventor on the Patent is in violation of 35 U.S.C. § 115. That section requires that "[t]he applicant shall make oath that he believes himself to be the original and first inventor of the ... composition of matter, or improvement thereof, for which he solicits a patent." 35 U.S.C. § 115. Based on this alleged violation, Plaintiffs seek relief pursuant to 35 U.S.C. § 256 in the form of "[a]n order revising the name of the inventor on the patent to name only the true inventors, namely Drs. Allen and Seligman," (Second Am.Compl. at 20).

Section 256 provides in pertinent part:

Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Commissioner may, on applica-

tion of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

35 U.S.C. § 256.

Cyanamid first argues the Plaintiffs' cause of action based on § 115 is misplaced since that section does not create a private cause of action but only a duty between the patent applicant and the Patent and Trademark Office. Cyanamid relies on *Wise v. Hubbard,* 769 F.2d 1, 3 (1st Cir.1985). There the First Circuit affirmed the granting of summary judgment dismissing plaintiff's claim of conversion on the grounds that the three-year statute of limitations had expired. Plaintiff argued the limitations period should have been tolled because, *inter alia,* defendant fraudulently concealed his actions in the face of the duty to disclose imposed by 35 U.S.C. § 115. The court rejected this argument, stating:

> This statute creates no duty between the patent applicant and the purported inventor. Instead, because the Patent and Trademark Office's interest is in rewarding the true inventor with the issuance of a letter patent, the sole duty created is between the applicant and the Office. Breach of this duty results in the patent being "unauthorized by law and void...." *Kennedy v. Hazelton,* 128 U.S. 667, 672, 9 S.Ct. 202, 203, 32 L.Ed. 576 (1888).

*Wise,* 769 F.2d at 3. Plaintiffs offer no authority to the contrary but contend "the violation is of § 115, and the remedy is under § 256." (Pls.' Br. Opp. Def.'s Mot. Summ.J. at 59.)

Cyanamid points out that Plaintiffs' right to pursue a cause of action under § 256 is questionable since they do not advance such cause of action in their Second Amended Complaint. Although Plaintiffs do not frame a cause of action under § 256, they assert this court's jurisdiction based in part on § 256, (Second Am.Compl. ¶ 7), and pray for "[a]n order revising the name of the inventor on the patent to name the only true inventors, namely Drs. Allen and Seligman," (*id.* at 20). Accepting that such pleading suffices under notice pleading requirements, I address whether Plaintiffs' request for the correction of the inventor's name under § 256 is fitting.

Cyanamid claims § 256 is intended to permit correction of inventorship where error is inadvertent and "without deceptive intent" and Plaintiffs' allegations of fraud on the part of Cyanamid render the section inapplicable. The rationale here is if the patentee applied for the patent with the deceptive intent of omitting an inventor, the patent is invalidated and cannot be corrected. *See General Elec. Co. v. Brandon,* 25 U.S.P.Q.2d 1885, 1887, 1992 WL 394933 (N.D.N.Y.1992).

Cyanamid acknowledges neither the Supreme Court nor the Federal Circuit has squarely addressed whether the words "without deceptive intent" in § 256 refer to the patentee, the omitted inventor, or both. Nevertheless, Cyanamid argues case law from the district courts supports the position that § 256 is inapplicable where a plaintiff alleges the defendant/patentee acted with deceptive intention when it failed to identify a true inventor.

Cyanamid relies on the recent decision of *McMurray v. Harwood,* 870 F.Supp. 917, 918–20 (E.D.Wis.1994) and cases cited therein. There, plaintiff, alleging his former employer wrongfully procured a patent on plaintiff's invention, sought correction of inventorship under § 256. In initially dismissing the action, the district court held plaintiff's § 256 claim deficient because that section 1) did not permit a complete substitution of one inventor for another; and 2) is not applicable where the error is a result of fraud on the part of the patentee. *Id.* at 918–20.

On a motion for reconsideration, the court recognized the 1982 amendments to § 256 permit the substitution of the name of the erroneously named patentee with that of the innocent inventor. However, the court held the 1982 amendments "did not overturn prior (and subsequent) authority which uniformly holds that § 256 does not permit 'correction' where the named person is accused of deception or fraud." *Id.* at 920–21. *See also General Elec. v. Brandon,* 25 U.S.P.Q.2d at 1887 (dismissing § 256 claim because "at a minimum there must be a lack of deceptive intention on the part of the person originally

named as the inventor.... [and] the tenor of the complaint is that defendant did not mistakenly name himself as the sole inventor.")

Plaintiffs contend "the cases are mixed on whether deceptive intention by the defendant precludes correction by the plaintiff, but on balance they do not support Cyanamid's contention." (Pls.' Br. Opp. Def.'s Mot. Summ.J. at 59.) They maintain the *General Electric* case is not conclusive because the plaintiff did not mention § 256 in the complaint and the court noted most of the cases allowing correction where there was deception on the part of the defendant were decided before the 1982 amendments.

The court in *General Electric*, however, determined the claim as if it had been framed under § 256 and noted the " 'deceptive intention' language was not changed in the 1982 amendment." *General Electric*, 25 U.S.P.Q.2d at 1887. Further, *McMurray* confirms the 1982 amendments did not overturn uniform authority disallowing correction under § 256 where the named patentee is accused of deception. 870 F.Supp. at 920–21.

Plaintiffs reliance on *Stark v. Advanced Magnetics, Inc.*, 29 F.3d 1570, 1573 (Fed.Cir. 1994) is misplaced. In *Stark*, the district court granted summary judgment to the defendant after finding the plaintiff failed to exercise diligence in seeking correction of the patent at issue. The Federal Circuit noted "[t]he purpose of § 256 was to provide a remedy for a bona fide mistake in inventorship. S.Rep. No. 1979, 82nd Cong., 2d Sess. 7 (1952), *reprinted in* 1952 U.S.C.C.A.N. 2394, 2401." *Id.* The court then reversed on the basis that § 256 does not require an omitted inventor must diligently bring a claim under it. *Id.* at 1574. The *Stark* court did not address the issue of whether § 256 permits a claim where an allegedly innocent plaintiff claims fraud on the part of defendant patentee.

Plaintiffs' reliance on *MCV, Inc. v. King–Seeley Thermos Co.*, 870 F.2d 1568 (Fed.Cir. 1989) is also to no effect. There, the court acknowledged that, only if co-inventorship were found, would it then "tackle the question of whether nonjoinder was 'without deceptive intention' within the meaning of section 256." *Id.* at 1571. The Federal Circuit did not find co-inventorship and therefore did not reach the issue under consideration.

Similarly, Plaintiffs' reliance on *Manildra Milling Corp. v. Ogilvie Mills, Inc.*, 783 F.Supp. 1288 (D.Kan.1990) is not persuasive. There, the court allowed correction under § 256 of errors resulting from "errors in judgment" in addition to those resulting from "inadvertence, accident or mistake." *Id.* at 1291. The court relied on the holding in *In re Schmidt*, 293 F.2d 274, 278–79 (C.C.P.A. 1961) which held § 256 should be given a liberal construction. However, as noted in *McMurray*:

> The liberal quality of the section derives from the fact that "innocent" errors should be easily and readily correctable on joint application. Not so where the parties are at each others' throats. Further, pursuant to § 256, the court may "order correction of the patent." Should the plaintiff demonstrate fraud, the patent would be per se invalid. Even the most "liberal" reading of § 256 can not turn the power to correct into the power to invalidate.

870 F.Supp. at 920–21 n. 1. I therefore conclude § 256 is not applicable here where Plaintiffs seek correction based on Cyanamid's alleged fraud and deception.

Plaintiffs argue

> [i]n any event, it may be premature to rule out the possibility as a matter of law that the naming of inventor was without deceptive intent at the time it occurred.... A jury may find that Dr. Ellenbogen is not the true inventor and that the Professors are, but that Cyanamid's naming of Dr. Ellenbogen was not intentionally deceptive but merely erroneous.

(Pls.' Br. Opp. Defs.' Mot. Summ.J. at 61.)

Once again, the remarks in *McMurray* are pertinent. Faced with plaintiffs' request to proceed with alternative theories under § 256, including the possibility that defendant acted without deception, the court stated: "Such a claim is so contrary to plaintiffs' original § 256 claim (and each of state theory) that it can hardly be deemed 'alternative.' Further, plaintiff's § 256 fraud claim would not be presented to the jury in any case because it has been dismissed as a matter of

law." · 870 F.Supp. at 920–21 (footnote omitted). I agree.

I therefore conclude, as a matter of law, Cyanamid is entitled to judgment on Plaintiffs' third cause of action for wrongful naming of inventor.

### 4. *Copyright Infringement.*

Plaintiffs and Cyanamid have filed cross-motions for summary judgment on this cause of action. In their fourth claim for relief, Plaintiffs allege the Article constitutes "an original work of authorship and is copyrightable subject matter," (Second Am.Compl. ¶ 67), and "Plaintiffs were the owner (sic.) of the copyright on the Article at the time portions of it were copied, including by means of tracing, and cutting and pasting, by Dr. Ellenbogen and/or the Cyanamid in-house patent attorney on behalf of Cyanamid," (*id.* ¶ 68). Plaintiffs maintain such actions of Cyanamid constitute copyright infringement. (*Id.* ¶ 69.) Plaintiffs seek, *inter alia*, Cyanamid's profits attributable to the copyright infringement and damages suffered by Plaintiffs due to the copyright infringement. (*Id.* at 20.)

Plaintiffs cite the requirements for establishing a copyright infringement case as follows:

> Reduced to most fundamental terms, there are only two elements necessary to the plaintiff's case in an infringement action: ownership of the copyright by the plaintiff and copying by the defendant.

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.01 (1994) (footnotes omitted).

---

1. The Copyright Act provides:
   (a) **Initial Ownership.**—Copyright in a work protected under this title vests initially in the author or authors of the work....
   (b) **Works Made for Hire.**—In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and ... owns all the rights comprised in the copyright. 17 U.S.C. § 201.

2. The copyright infringement allegedly occurred in about December 1981 when Cyanamid sub-

### a. *Ownership of the Copyright.*

■ Plaintiffs have obtained a copyright registration certificate in the name of the Regents from the Copyright Office "for both the Article as it was submitted to the *New England Journal* and the Article as it was submitted to· *Obstetrics and Gynecology.*" (Pls.' Br. Supp. Mot. Partial Summ.J. at 65). They claim "such certificates constitute prima facie evidence of ownership by the Regents." (*Id.*)

Cyanamid "disputes the legal import of plaintiffs' recently-obtained registration certificate." (Def's. Memo Law Opp. Pls.' Mot. Partial Summ.J. & Supp. Mot. Partial Summ.J. at 26.) It points out Plaintiffs first sought copyright registration certificates in December 1993, only after commencement of this lawsuit and more than ten years after publication of the Article containing the allegedly protected figures and table. Cyanamid correctly notes a certificate of registration is only prima facie evidence of the validity of the copyright if the registration is· sought within five years of the first publication of the work. 17 U.S.C. § 410(c). Notably, however, "[t]he evidentiary weight to be accorded the certificate of a registration made thereafter shall be in the discretion of the court." *Id.*

Plaintiffs maintain the Regents "are quite obviously the owner, because the Article is a 'work made for hire' by the co-authors done within the scope of their employment." [1] (Pls.' Reply Br. Supp. Mot. Partial Summ.J. at 29 n. 55) Plaintiffs argue Cyanamid has offered no evidence to rebut such ownership. I agree.

Cyanamid offers no evidence which places in issue the original authorship of the Article by Drs. Allen and Seligman, nor the Regents' entitlement to ownership of the copyright as their employer. [2] I therefore conclude Plain-

---

, mitted its patent application. The Article was accepted for publication in August 1982 and published in the March 1983 issue of *Obstetrics and Gynecology.* The Article as published reflects a copyright in 1983 by the American College of Obstetricians and Gynecologists. (Second Am. Compl., Ex. A at 362.) This is not discussed in the briefs. However, if Plaintiffs assigned the copyright to the American College of Obstetricians and Gynecologists, this would have occurred after the alleged infringement in December 1981.

tiffs have satisfied the first requirement of ownership of the copyright.

### b. *Copying by Cyanamid.*

Cyanamid points to no specific facts to dispute the figures and tables of the patent application are substantially similar to and are copied from the figures and tables of the Article. Cyanamid principally argues no copyright infringement occurred because Dr. Allen authorized it to copy the figures and table into the patent application and that such figures and table are not copyrightable subject matter. Cyanamid also contends any profits earned by Cyanamid are too attenuated to the alleged infringement to permit an award of such profits to Plaintiffs.

### c. *Authorization to Copy.*

■ Cyanamid, relying on a September 24, 1981 letter from Dr. Allen to Dr. Ellenbogen, claims it had authority to copy the table and figures in the Article. That letter reads in pertinent part: "I am pleased to grant permission to you and Lederle Laboratories to use and circulate the results of our studies concerning the absorption of iron from prenatal multivitamin-mineral supplements prior to their publication." (Pls.' Br. Supp. Mot. Partial Summ.J., Att. E, Ex. 60.)

Plaintiffs counter this letter does not constitute evidence that Dr. Allen authorized Cyanamid to copy the figures and table from the Article. They maintain "[t]he reason was that scientific journals frown upon or outright prohibit the presentation of literal portions of articles to be published prior to the actual publication." (Pls.' Reply Br. Supp. Mot. Partial Summ. at 30.) Plaintiffs note Dr. Ellenbogen was copied on a letter containing such prohibition from the *Journal of Obstetrics and Gynecology* when it accepted the Article. (Pls.' Br. Supp. Mot. Partial Summ., Att. E at 379 and Ex.67.) Moreover, Dr. Ellenbogen acknowledged this is a common type of prohibition by a journal. (*Id.* at 379.)

Thus, the evidence offered contradicts Cyanamid's contention that Dr. Allen authorized the copying of the figures and the table in the Article.

### d. *Copyrightable subject matter.*

■ Plaintiffs seek copyright protection for Figures 1–4 and Table 1 of the draft Article submitted to the *New England Journal of Medicine.* (*See* Pls.' Br. Supp. Mot. Partial Summ., Att. E, Ex. 42.) The four figures employ bar graphs and data points to depict the results of Studies I, IA, II, III, and IV. Table I summarizes the results of several studies. Cyanamid argues the figures and table do not merit copyright protection and therefore summary judgment is appropriate for Cyanamid. I disagree.

"Liability for copyright infringement will only attach where *protected elements* of a copyrighted work are copied." *Gates Rubber Co. v. Bando Chemical Inds., Ltd.,* 9 F.3d 823, 833 (10th Cir.1993) (emphasis in original). In *Feist Publications, Inc. v. Rural Telephone Service Co.,* the Court held "facts are not copyrightable ... compilations of facts generally are." 499 U.S. 340, 344, 111 S.Ct. 1282, 1287, 113 L.Ed.2d 358 (1991). The *Feist* Court after noting that facts are uncopyrightable, discussed the requirement of originality in the compilation of the facts to render such presentation copyrightable:

> As discussed earlier, however, the originality requirement is not particularly stringent. A compiler may settle upon a selection or arrangement that others have used; novelty is not required. Originality requires only that the author make the selection or arrangement independently (*i.e.,* without copying that selection or arrangement from another work), and that it display some minimal level of creativity. Presumably, the vast majority of compilations will pass this test, but not all will. There remains a narrow category ·of works in

Even if the copyright was assigned to the American College only after the infringement, it may affect the amount of damages arising out of the infringement. Conceivably, Plaintiffs cannot claim profits or damages attributable to the infringement for the period of assignment of the ·copyright.

which the creative spark is utterly lacking or so trivial as to be virtually nonexistent. *Id.* at 358–359, 111 S.Ct. at 1294–95.

Thus the issue is whether Plaintiffs "selected, coordinated, or arranged," (*id.* at 362, 111 S.Ct. at 1296), the facts in an original way. *Feist* stresses "originality is not a stringent standard; it does not require that facts be presented in an innovative or surprising way." (*Id.*) That case concerned whether the white pages of a telephone book were copyrightable. Because the names and numbers were uncopyrightable facts, any copyright could only be based on the "selection, coordination, and arrangement," (*id.*), of those facts. The Court held the preparation of the white pages of a telephone book involved simply taking the data provided by subscribers and listing it alphabetically by surname. "The end product is a garden-variety white pages directory, devoid of even the slightest trace of creativity." (*Id.*) The same cannot be said here.

The authors of the Article selected facts to be presented and coordinated and arranged them in bar chart fashion in the figures and in columned and lined tables in Table I so as to present a considerable amount of information in a small space. There is no doubt that the degree of originality in this "selection, coordination, and arrangement" of facts is in a higher order of magnitude than that involved in listing data in a practically inevitable alphabetical way.

The cases cited by Cyanamid do not persuade me that the authors' compilation in this case did not meet the "minimal level of creativity," (*id.* at 358, 111 S.Ct. at 1294), required by the Court in *Feist. See, e.g., Sinai v. Bureau of Automotive Repair,* 25 U.S.P.Q.2d 1809, 1811, 1992 WL 470699 (N.D.Cal.1992) (arrangement of emission control system information in form of columnar grid "neither original nor protectible"); *Victor Lalli Enters. v. Big Red Apple, Inc.,* 936 F.2d 671, 673 (2nd Cir.1991) (charts used in illegal gambling operations in New York City reporting winning numbers on purely functional grids that offered no opportunity for variation, did not meet minimum standards of originality for copyright protection); *Matthew Bender & Co., Inc. v. Kluwer Law Book Publishers, Inc.,* 672 F.Supp. 107, 109–111 (S.D.N.Y.1987) (arrangement of information relating to personal injury and wrongful death awards and settlements in chart lacked a modicum of selectivity precluding the assertion of copyright).

Other cases have reached the contrary conclusion. *See CCC Info. Servs., Inc. v. Maclean Hunter Market Reports, Inc.,* 44 F.3d 61, 67–68 (2nd Cir.1994) (selection and arrangement of data in car valuation guide "displayed amply sufficient originality to pass the low threshold requirement to earn copyright protection"); *Kregos v. Associated Press,* 937 F.2d 700, 710 (2nd Cir.1991) (table showing statistics of baseball pitchers copyrightable because requisite creativity shown in selection of statistics).

I conclude the figures and table in the Article constitute copyrightable subject matter, entitled to protection.

e. *Damages.*

■ Cyanamid argues any profits earned by Cyanamid are too attenuated to the alleged infringement to permit an award of such profits to Plaintiffs. Only ownership of the copyright and copying by the defendant are necessary to succeed in an infringement action. Nimmer & Nimmer, *supra,* § 13.01. Therefore, Plaintiffs are entitled to judgment on their copyright claim regardless of whether they can later show damages.

The Copyright Act provides that a plaintiff may recover "actual damages and any additional profits of the infringer." 17 U.S.C. § 504(a)(1). Notably, under the Act, "the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.* § 504(b). Moreover, "[a]s long as proximate causation is demonstrated, it would seem that profits 'attributable to the infringement' could include even those attributable only indirectly." Nimmer & Nimmer, *supra,* § 14.03[A]; *see Cream Records, Inc. v. Jos. Schlitz Brewing Co.,* 754 F.2d 826, 828 (9th Cir.1985) (plaintiff awarded some of the defendant's malt liquor sales

profits adjudged indirectly attributable to the use of plaintiff's copyrighted music in a commercial.)

Plaintiffs have satisfied the requisite elements of their copyright cause of action against Cyanamid. I therefore grant summary judgment to Plaintiffs on their fourth cause of action.

### 5. *Misappropriation.*

In their fifth claim for relief, Plaintiffs' claim "Cyanamid's actions are likely to cause confusion as to the source of the invention embodied in the reformulated Materna and to damage the reputation of Drs. Allen and Seligman," (Second Am.Compl. ¶ 71,) and "constitute misappropriation of Plaintiffs' business value and unfair competition," (*Id.* ¶ 72). Plaintiffs accept Cyanamid's characterization of this claim as incorporating two distinct causes of action: defamation and misappropriation of business value (or unfair competition).

#### a. *Defamation.*

■■■ Plaintiffs elaborate on this claim as follows:

Cyanamid's actions constitute disparagement and defamation of Drs. Allen and Seligman, in that Cyanamid's filing of the patent naming Dr. Ellenbogen as sole inventor causes the scientific community to believe that Drs. Allen and Seligman merely copied Dr. Ellenbogen's work to prepare the Article and that Drs. Allen and Seligman wrongfully omitted Dr. Ellenbogen as an author on the Article.

(Second Am.Compl. ¶ 73.)

■■■ Colorado law recognizes two types of libel: libel per se and libel per quod. *Lind v. O'Reilly*, 636 P.2d 1319, 1320–21 (Colo.Ct. App.1981). "A published statement ... is libelous *per se* if it is defamatory on its face, such that no extrinsic evidence is necessary to show either its defamatory nature or that it is of and concerning the plaintiff." *Id.* at 1320 (citations omitted).

Here, the statement not being libel per se, must if libelous be libel per quod and is "actionable only if special damages are pleaded and can be proved." *Id.* Such damages "do not include injuries to a plaintiff's reputation or feelings which do not result in specific monetary loss." (*Id.* at 1321.) Plaintiffs have not pleaded and cannot prove special damages.

Plaintiffs reliance on *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 408 F.Supp. 1219 (D.Colo.1976), aff'd, 561 F.2d 1365 (10th Cir.1977) is to no avail. There, plaintiff prevailed after a jury trial on claims of trademark infringement and trademark disparagement stemming from Goodyear's use of plaintiff's trademark "BIG FOOT." The trial court denied Goodyear's motions for judgment notwithstanding the verdict or for a new trial, upheld the jury's verdicts, and permitted the award of damages notwithstanding plaintiff's failure to prove special damages. The case at bar does not concern a claim of trademark disparagement; nor does *Big O Tire* alter the requirement under Colorado law of special damages concerning libel per quod.

Accordingly, insofar as this cause of action is for defamation, it must fail.

#### b. *Unfair Competition.*

■■■ Plaintiffs allege "Cyanamid's actions are likely to cause confusion as to the source of the invention embodied in Materna," (Second Am.Compl. ¶ 71), and that such actions amount to misappropriation of business value and unfair competition, (*id.* ¶ 72). Cyanamid argues Plaintiffs have not adduced any evidence to support their claim.

"The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting *consumers* from confusion as to source." *Bonito Boats, Inc. v. Thunder Crafts Boats, Inc.*, 489 U.S. 141, 157, 109 S.Ct. 971, 981, 103 L.Ed.2d 118 (1989). Generally, "the common-law tort of unfair competition has been limited to protection against copying of nonfunctional aspects of consumer products which have acquired secondary meaning such that they operate as a designation of source." *Id.* at 158, 109 S.Ct. at 981. Thus, the tort is commonly asserted to protect trade marks and trade names. *See Adolph Coors Co. v. A. Gender-*

son & Sons, Inc. 486 F.Supp. 131, 136 (D.Colo.1980).

Both Plaintiffs and Cyanamid cite *American Television & Communications Corp. v. Manning,* 651 P.2d 440 (Colo.Ct.App.1982) as the leading Colorado case concerning unfair competition. There, the plaintiffs held the exclusive rights to display programs for Home Box Office ("HBO"). Plaintiff leased to each of its subscribers a special antenna and converter to enable viewing of HBO programs. Defendants installed antennas and converters capable of receiving the HBO signal. The court reversed a denial of a preliminary injunction, finding establishment of the undisputed fact that defendants were wrongfully interfering with plaintiffs' exclusive rights to provide HBO.

Cyanamid contends under Colorado law, the claim for misappropriation of business value envisions a wrongful appropriation by one competitor of the skill or labor of another. I agree. Plaintiffs misread *American Television* in maintaining that the plaintiff and defendant in that case were not competitors. Plaintiffs took no steps to exploit their alleged invention commercially, they were not competitors and, therefore had no business for Cyanamid to misappropriate. Thus, the undisputed facts show no basis for an unfair competition claim.

For these reasons Cyanamid is entitled to judgment on Plaintiffs' misappropriation claim.

6. *Breach of Confidentiality Obligation.*

█ Plaintiffs allege: "Cyanamid's actions in distributing the manuscripts furnished on a confidential basis by Dr. Allen to Dr. Ellenbogen constitute breach of the obligation of confidentiality reposed by Dr. Allen and accepted by Dr. Ellenbogen." (Second Am.Compl. ¶ 78.)

Cyanamid contends the gravamen of this claim is that Dr. Ellenbogen breached the confidential relationship between himself and Dr. Allen. It correctly notes in Colorado "we do not recognize a separate tort founded upon breach of a confidential relationship." *Bock v. Brody,* 870 P.2d 530, 533 (Colo.App. 1993); *see also Todd Holding Co. v. Super*

*Valu Stores, Inc.,* 874 P.2d 402, 403 (Colo. App.1993).

Plaintiffs acknowledge Colorado law does not provide a separate cause of action for breach of a "confidential relationship." They argue, however, "Colorado law does provide that a confidential relationship may give rise to obligations to maintain information in confidence," (Pls. Br. Opp. Def.'s Mot. Summ.J. at 57), and that the latter obligation is "quite clearly actionable," (*id.*) Neither of the cases cited by Plaintiffs, however, involved a separate claim for breach of confidentiality obligation. *Kodekey Electronics, Inc. v. Mechanex Corp.,* 486 F.2d 449 (10th Cir.1973) concerned trade secrets disclosed in breach of a secrecy agreement signed by defendant. The court held such disclosure constituted unfair competition. It did not recognize a separate tort for breach of confidentiality obligation.

In *Saine v. A.I.A., Inc.,* 582 F.Supp. 1299, 1309 (D.Colo.1984), I denied a motion for more definite statement on a counterclaim based on unfair competition. Defendant alleged plaintiff and a third-party defendant conspired to obtain confidential information from it. These allegations were advanced not in support of a breach of confidentiality obligation but in support of defendant's counterclaim of unfair competition and unfair trade practices.

Because Colorado law does not recognize a separate tort of breach of confidentiality obligation, Cyanamid is entitled to judgment on Plaintiffs' seventh claim for relief.

7. *Unjust Enrichment.*

█ In their eighth claim for relief, Plaintiffs allege: "Cyanamid's actions constitute unjust enrichment." Cyanamid contends the undisputed facts mandate summary judgment in its favor on this cause of action.

In *Cablevision of Breckenridge v. Tannhauser Condominium Association,* the Colorado Supreme Court stated in order to recover under a quasi-contract or unjust enrichment theory,

a plaintiff must show (1) that a benefit was conferred on the defendant by the plaintiff, (2) that the benefit was appreciated by the

defendant, and (3) that the benefit was accepted by the defendant under such circumstances that it would be inequitable for it to be retained without payment of its value. Application of the doctrine does not depend upon the existence of a contract, express or implied in fact, but on the need to avoid unjust enrichment of the defendant notwithstanding the absence of an actual agreement to pay for the benefit conferred. The scope of this remedy is broad, cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another.

649 P.2d 1093, 1096–97 (Colo.1982) (en banc) (citations omitted).

In their interrogatory responses, Plaintiffs claim to have conferred two benefits on Cyanamid: (i) the "invention of the reformulation and the communication of such invention" by a March 4, 1980 letter from Dr. Allen to Dr. Ellenbogen, (Def.'s Memo Law Supp. Mot. Summ.J., Thomasch Aff., Ex. 1 at Response No. 1) and (ii) a "Patent monopoly," (*id.* at Response No. 2). Cyanamid maintains neither alleged benefit is sufficient to support Plaintiff's unjust enrichment claim.

Cyanamid claims, to the extent the claim is based on "the invention of the reformulation and the communication of such invention," Plaintiffs have not established that they had any expectation of compensation from the disclosure of information regarding the reformulation. *See Britvar v. Schainuck,* 791 P.2d 1183, 1184–85 (Colo.Ct.App.1989). Cyanamid cites Dr. Allen's testimony that he "did not think that [he] was owed any additional monies for the studies we had performed." (Thomasch Aff., Ex. 6 at 968.) Plaintiffs do not respond to this argument. However, Dr. Allen's comments construed in the light most favorable to Plaintiffs, do not preclude the possibility that, although he expected no further payment for the studies themselves, had he known of Cyanamid's patent application arising from the disclosure, he would have expected additional compensation.

" 'A person confers a benefit upon another if he . . . in any way adds to the other's security or advantage.' " *Cablevision of Breckenridge,* 649 P.2d at 1097 (citing the *Restatement of Restitution* § 1, comment b (1937)). Cyanamid has not established as an undisputed issue of fact that Plaintiffs did not confer a benefit on it by disclosing information concerning the reformulation and that Cyanamid did not inequitably benefit from such disclosure. Therefore, summary judgment on the unjust enrichment claim is denied.

### 8. *Statute of Limitations.*

■ Cyanamid seeks summary judgment on the grounds that each of Plaintiffs' claims is barred by the applicable statute of limitations, none of which provides for a limitation period in excess of four years.

Colorado has adopted a date-of-discovery rule for the purpose of determining when a cause of action accrues. Under this rule, a cause of action typically accrues when the tortious act is discovered or should have been discovered by the exercise of reasonable diligence. *See* Colo.Rev.Stat. § 13–80–108 (1987).

"[T]he focus is on a plaintiff's knowledge of facts which would put a reasonable person on notice of the general nature of damage and that the damage was caused by the wrongful conduct. . . ." *Morris v. Geer,* 720 P.2d 994, 997 (Colo.Ct.App.1986). "The time when a plaintiff discovered, or through the use of reasonable diligence should have discovered, the [wrongful] conduct is normally a question of fact which must be resolved by the trier of fact." *Id.* "[O]nly in the clearest of cases may a summary judgment motion be granted where discovery of the injury is the pivotal issue." *Mastro v. Brodie,* 682 P.2d 1162, 1169 (Colo.1984) (en banc).

Cyanamid does not contend it is undisputed that Plaintiffs had actual knowledge of their claims at a time that would bar such claims. However, it contends Plaintiffs should have known of the Patent long before August 1989 (four years before this action commenced). In support, Cyanamid relies on the promotions and advertising of the Materna product after the patent issued in

February 1984; the Patent label marked on the commercial bottle of Materna;[3] the issuance of the Patent and its recordation in the Patent Office;[4] the Materna entry referencing the patent in the *Physicians Desk Reference* book, copies of which were maintained by the University of Colorado; Drs. Allen and Seligman's continued performance of studies for Cyanamid on Materna both before and after the patent issued; and Dr. Seligman's prescription of Materna after the issue of the patent.

Plaintiffs respond the patent notice was tiny and buried in the Materna label; the Materna labels furnished to Drs. Allen and Seligman were over-stickered with a special "FOR INVESTIGATIONAL USE ONLY" label that did not contain the patent notice; the patent notice merely states "Patented" and gives the United States patent number and could have pertained to any of the ingredients, the manufacturing process or even the packaging; the advertisements referred to by Cyanamid ran a total of four times in *Obstetrics and Gynecology,* a journal directed toward obstetricians and gynecologists rather than hematologists; Dr. Seligman already knew the content of the Materna he prescribed and therefore had no need to consult the *Physicians Desk Reference* or label each time he prescribed it.

Viewing the facts in the light most favorable to plaintiffs, they do not establish that Plaintiffs, by the use of reasonable diligence, should have discovered the Patent. This is not the clearest of cases and therefore summary judgment is not appropriate on the issue of due diligence.

■ Plaintiffs argue additionally that the statutes of limitations and laches do not run against the University or the Regents as they are part of the State of Colorado. Under the *nullum tempus* doctrine, statutes of limitation and laches normally do not apply against federal and state entities. *City of Colorado Springs v. Timberlane Assocs.,* 824 P.2d 776, 780 (Colo.1992) (en banc).[5]

Cyanamid responds neither the University nor the Regents has a claim against it because Drs. Allen and Seligman did not follow the University's patent policy and there was no assignment of rights. Further, even if the University had any rights in the alleged invention, Cyanamid contends the University assigned such rights to the Foundation. Because I find factual issues preclude summary judgment on the basis of the applicable statutes of limitations, I do not reach this issue.

## IV. *Order.*

IT IS ORDERED THAT Plaintiffs' Motion for Partial Summary Judgment is DENIED on the first and second causes of action and GRANTED on the fourth cause of action;

IT IS FURTHER ORDERED THAT Defendant's Motion for Partial Summary Judgment is DENIED on the fourth cause of action;

IT IS FURTHER ORDERED THAT Defendants' Motion for Summary Judgment is GRANTED on the first, third, fifth and seventh causes of action and DENIED on the second, fourth, sixth and eighth causes of action.

---

**3.** Cyanamid cites *American Medical Systems v. Medical Engineering Corp.,* 6 F.3d 1523, 1537 (Fed.Cir.1993) which held that patent marking in compliance with statute is *in rem* notice entitling the patentee to recover damages from a patent infringer. As Cyanamid acknowledges, however, no case holds that marking is notice to the world for the purpose of the statute of limitations.

**4.** The Supreme Court's dicta in *Sontag Chain Stores Co. v. National Nut Co.,* 310 U.S. 281, 295, 60 S.Ct. 961, 967–68, 84 L.Ed. 1204 (1940) and other cases cited by Cyanamid to the effect that the issuance of a patent is notice to the world for certain purposes, do not support the conclusion that such issuance is notice for all purposes, including the statute of limitations.

**5.** "The origin of governmental immunity from statutes of limitations is found in the English common law rule of '*nullum tempus occurrit regi,*' or, 'time does not run against the king.'" *Colorado Springs v. Timberlane Assocs.,* 824 P.2d 776, 777 (Colo.1992) (en banc) (footnote omitted).