**UNIVERSITY OF COLORADO FOUNDA-TION, INC., a Colorado not-for-profit corporation, The University of Colorado, an institution of the State of Colorado, The Board of Regents of the University of Colorado, a body corporate of the State of Colorado, Robert H. Allen, an individual, and Paul A. Seligman, an individual, Plaintiffs,**

v.

**AMERICAN CYANAMID COMPANY, a Maine corporation, Defendant.**

**Civil Action No. 93–K–1657.**

United States District Court, D. Colorado.

July 7, 1997.

As Corrected July 8, 1997.

Harold A. Haddon, Haddon, Morgan & Foreman, P.C., Robert N. Miller, LeBoeuf, Lamb, Greene & MacRae, L.L.P., Denver, CO, for plaintiffs.

Daniel E. Thomasch, Richard J. DeMarco, Jr., Donovan, Leisure, Newton & Irvine, New York City, Roger P. Thomasch, Ballard, Spahr, Andrews & Ingersoll, Denver, CO, for defendant.

## MEMORANDUM DECISION

KANE, Senior District Judge.

This action began in August 1993. Previously published opinions on the parties' cross-motions for summary judgment and on American Cyanamid's motion for reconsideration can be found at 880 F.Supp. 1387, 1995 Copr. L. Dec. ¶ 27,447,99 Ed. Law Rep. 821, 35 U.S.P.Q.2d 1737 (D.Colo.1995) and 902 F.Supp. 221, 105 Ed. Law Rep. 435, 37 U.S.P.Q.2d 1406 (D.Colo.1995).

Trial to the court was held beginning May 2, 1996, and concluded May 24, 1996. On September 18, 1996 the parties filed corrections to their proposed findings of fact and conclusions of law submitted before trial. I have reviewed those proposed findings and conclusions as well as the transcript of proceedings, the exhibits admitted at trial, the parties' briefs and the record of the proceedings. What follows are my findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure.

## I. *JURISDICTION.*

Jurisdiction is uncontested. It is based in part on 28 U.S.C. §§ 1331 and 1338(a) because Plaintiffs sought relief under the Patent Act, 35 U.S.C. § 256 and the Copyright Act, 17 U.S.C. §§ 101–810, and also on 28 U.S.C. § 1332 because there are common law claims, the case is between citizens of different states and the matter in controversy exceeds the statutory threshold, exclusive of interest and costs.

## II. *THE PARTIES.*

Plaintiffs are the University of Colorado, an institution of the State of Colorado created by the Constitution of Colorado (the Uni-

versity) and governed by the Board of Regents, also created by the Constitution of Colorado (the Regents); The University of Colorado Foundation, Inc., a Colorado not-for-profit corporation with its principal place of business in Boulder, Colorado (the Foundation); Robert H. Allen, M.D., a professor of medicine, professor of biochemistry and Director of Hematology at the University of Colorado Health Sciences Center (Dr. Allen); and Paul A. Seligman, M.D., a hematologist and professor of medicine at the University of Colorado Health Sciences Center (Dr. Seligman).

Defendant American Cyanamid Company (Cyanamid) is a Maine Corporation qualified to do business in the State of Colorado.

### III. SUMMARY.

Plaintiffs allege that Drs. Allen and Seligman performed a number of studies related to the prenatal multivitamin supplement called Materna, which was manufactured and sold by Cyanamid, and that in the course of those studies, Drs. Allen and Seligman invented a reformulation of Materna and informed Cyanamid of the reformulation. Thereafter, the doctors prepared an article describing their studies and their reformulation invention and furnished Cyanamid a confidential copy of the pre-publication draft of the article. Plaintiffs charge Cyanamid wrongfully copied the article into a patent application and filed the application in its own name without informing Plaintiffs, without naming the doctors as the inventors and naming instead Cyanamid's employee, Leon Ellenbogen, Ph.D. (Dr. Ellenbogen), as the sole inventor. A patent was issued to Cyanamid on February 14, 1984 (the "Patent") and Cyanamid sold the reformulated Materna under that Patent thereafter. Plaintiffs claim Cyanamid exercised its patent rights to prevent others from manufacturing or selling the reformulation and concealed the existence of the Patent from Plaintiffs until they discovered it in or about June 1993.

The Second Amended Complaint set forth eight claims for relief: conversion, fraud, wrongful naming of inventor in violation of 35 U.S.C. § 115, copyright infringement, misappropriation of Plaintiffs' business value, patent infringement, breach of confidentiality obligations and unjust enrichment.

In my decision on the parties' cross-motions for summary judgment issued April 3, 1995, I found Cyanamid was entitled to judgment on the claims for conversion, wrongful naming of inventor, misappropriation and breach of confidentiality obligation, *University of Colorado v. Cyanamid* (Cyanamid I), 880 F.Supp. 1387, 1403–04 (D.Colo.1995), but I declined to rule on Cyanamid's assertion that Plaintiffs' remaining claims were time-barred because the statute of limitations defense hinged on disputed questions of fact. *Id.* at 1406. I granted judgment in favor of Plaintiffs on the claim for copyright infringement, *id.* at 1400–02, and ruled that the remaining three claims would go to trial.

Cyanamid moved for reconsideration of the patent infringement ruling, arguing none of the Plaintiffs could establish themselves as equitable title holders of the Patent entitled to relief. I granted the motion and, upon reconsideration, granted summary judgment in favor of Cyanamid on the patent infringement claim. *University of Colorado v. Cyanamid* (Cyanamid II), 902 F.Supp. 221, 222–23 (D.Colo.1995).

Thus, two claims remained for trial: the claim for fraud based on failure to disclose the Patent and the claim for unjust enrichment. The question of what damages, if any, were to be awarded Plaintiffs on their copyright infringement claim, was also reserved for trial.

At trial, Cyanamid denied any basis for damages and denied liability on the claims for fraud and unjust enrichment. It argued that neither the University, the Regents nor the Foundation had standing to bring claims because Drs. Allen and Seligman failed to comply with the University Patent Policy and because the doctors' manuscript did not constitute a work for hire. Cyanamid maintained the fraud claim was time-barred under applicable statutes of limitations, and argued the claim for equitable relief was barred by the doctrines of laches, unclean hands and estoppel.

As to the merits of Plaintiffs' claims, Cyanamid argued that its employees were the true inventors of the reformulation; that it is the lawful owner of the Patent, and that the proper inventor was named on the Patent;

and denied that any Cyanamid employee made misrepresentations regarding the Patent or its existence or concealed the existence of the Patent from the Plaintiffs. Cyanamid further argued that Plaintiffs failed to apply for a patent within the time limits set by 35 U.S.C. § 102(b) and that Plaintiffs' failure in this regard was not caused, induced or contributed to in any way by Cyanamid.

Other issues are implicit and will be discussed as they arise.

## IV. *DISCUSSION.*

### A. *Facts.*

Much of the evidence was sharply contested. Some, of course, was not. From the totality of evidence, I make the following findings of fact:

#### 1. *Background.*

Dr. Robert Allen is an internationally recognized hematologist and Director of the Division of Hematology at the Health Sciences Center. He is fifty-nine years old and a graduate of Amherst College with a B.A. in philosophy. He engaged in his pre-medical school studies at the University of California at Berkeley and received his M.D. degree in 1966 from the Washington University School of Medicine in St. Louis, Missouri. After serving an internship, a residency and a fellowship in hematology/oncology he became an assistant and then Associate Professor of Medicine at Washington University. In 1977 he joined the faculty at the Health Sciences Center as a Professor of Medicine and Director of the Division of Hematology, and in 1980 he became a professor of biochemistry as well. He has numerous academic honors, professional awards, memberships and board certifications. His bibliography exceeds one hundred published papers, abstracts and articles and he is the inventor or co-inventor of eleven issued patents. Dr. Allen's major scientific interest is cobalamin metabolism and the cellular uptake of macromolecules.

Paul A. Seligman is a fifty-one year old physician and Professor of Medicine at the Health Sciences Center. He received his Bachelor of Science degree from Michigan State University in 1968 and his M.D. degree in 1972 from the State University of New York at Buffalo School of Medicine. Following a residency in internal medicine in 1975, he became a Fellow in Hematology–Oncology at Washington University School of Medicine, St. Louis, Missouri. He completed that fellowship after moving to the University of Colorado School of Medicine where he began as an assistant professor in 1978. He has received numerous honors and elections to prestigious scientific organizations, is a founding member of the American Academy of Hospice Physicians and serves on various faculty committees at the University. He is course director in medicine for junior medical students, director of elective courses for senior medical students and course director for sophomore medical students in hematology and pathophysiology of disease. He is also the Director/Preceptor in Hospice Medicine for senior medical students and has authored or co-authored more than 25 original articles and eight book chapters. Dr. Seligman's major scientific interest is in cell surface receptors and the cellular uptake of iron.

Approximately 20% of a Department of Medicine faculty member's salary is paid by the State of Colorado. The professors are expected to generate the remainder through research grants. Most of these grants come from the National Institutes of Health with the expectation that some clinical application of the research will be achieved or eventually developed, and some funds are received from private bequests. In addition, researchers are asked on occasion to conduct tests or research for private organizations. The latter occurred in this case.

Dr. Ellenbogen was the Chief of Nutritional Science at Cyanamid's Lederle Laboratories Division. His duties included clinical and technical management of all nutritionals, hematinics and vitamins. He is a chemist who received a B.S. degree from the City College of New York, 1949, an M.S. from New York University in 1951, and his Ph.D. from Indiana University in 1954. Dr. Ellenbogen has served since 1978 as an Adjunct Professor of Nutrition at the Cornell University Medical College, and is named as the inventor on the Patent, as well as on ten other patents.

### 2. The Friendship.

While he was a research fellow, Dr. Allen first learned of Dr. Ellenbogen and his work through an article in the Journal of Biological Chemistry and contacted Dr. Ellenbogen by telephone to purchase a starting material (hog stomach powder) for his work in progress. Shortly thereafter, in 1972, the two met at an American Hematology Society gathering and a professional relationship developed based on their mutual interest in vitamin B12 research. Dr. Ellenbogen had changed the focus of his research, but wished to be kept apprised in the field in which Dr. Allen continued to be directly engaged. Because the two shared a common interest but were not competing, the relationship was mutually beneficial.

Dr. Ellenbogen wanted to keep current in the B12 field because he reviewed articles on the subject and requested Dr. Allen to provide him with prepublication copies of manuscripts Dr. Allen wrote. Dr. Ellenbogen agreed to treat these manuscripts in a confidential manner and not disseminate them without Dr. Allen's consent. From that time on, the two engaged in telephone conversations, correspondence and personal visits at professional meetings.

The nature of their relationship was an intellectual exchange stimulated by Dr. Allen sending manuscripts and other academic products such as lecture slides to Dr. Ellenbogen, who in turn supplied Dr. Allen with the material (hog stomach powder) required for his research. This alliance was strengthened in 1975 when Dr. Ellenbogen wrote Dr. Allen asking him to meet Dr. Ellenbogen's son who was applying to medical schools and, if Dr. Allen thought it appropriate, to write a letter of recommendation to the Washington University School of Medicine's admissions committee. Dr. Allen agreed, found the young man to be an outstanding candidate, and was pleased to serve as a reference for him.

From 1972 to 1977 the relationship between the two scientists developed to the point that Dr. Ellenbogen would describe certain problems existing at Lederle to Dr. Allen with complete confidence that he would keep them confidential and Dr. Allen would describe his latest research techniques and activities without worrying that Dr. Ellenbogen would appropriate them for his own use.

In 1977 Dr. Ellenbogen received a new title at Lederle relating to professional services. In this capacity, he became a scientific advisor who provided technical assistance to the company's marketing efforts with respect to vitamins and other nutritional products. In January 1978 Dr. Ellenbogen contacted Dr. Allen with reference to a vitamin B12 absorption problem experienced by patients with pernicious anemia. Dr. Allen agreed to undertake in vitro assays of samples of intrinsic factor, a purified substance derived from hog stomach powder, to correlate the test results with in vivo tests by a Florida physician of a patient suffering from pernicious anemia. The desired result was to replace in vivo testing with Dr. Allen's laboratory methods. i.e., in vitro testing. Dr. Allen conducted the assays and sent the results to Dr. Ellenbogen. Although no fee had been established for these tests before they were undertaken, Lederle sent Dr. Allen a $500 honorarium that he deposited in a research account at the University.

The intellectual exchange continued as Dr. Allen sent Dr. Ellenbogen copies of prepublication manuscripts and Dr. Ellenbogen sent prepublication copies of his reviews to Dr. Allen. The reviews received by Dr. Allen always dealt with intrinsic factor and transcobalamins, the proteins that bind vitamin B12 to different tissues in the body. Dr. Ellenbogen continued to send intrinsic factor samples to Dr. Allen who performed assays on them and Lederle paid accordingly. Through the University, Dr. Allen instituted a patent application for his invention of the assay procedure. He and Dr. Ellenbogen discussed the University's patent procedures and Dr. Allen provided Dr. Ellenbogen with copies of the data he had filed with the University in connection with the application.

### 3. The Problem.

In early 1979 Dr. Ellenbogen called Dr. Allen as part of their continuing dialogue on intrinsic factor, in vitro analysis and review articles. During the conversation, Dr. Ellenbogen mentioned for the first time that Lederle had a very important prenatal vitamin compound called Materna. Dr. Allen had no

familiarity with the product though he was aware of the medical significance of prenatal vitamins.

Dr. Ellenbogen advised Dr. Allen that Stuart Pharmaceuticals was Lederle's major competitor in the prenatal vitamin market through its product, "Stuartnatal," with each company commanding 40 to 45% of the market. He told Dr. Allen that the salespeople for Stuart Pharmaceuticals when making detail calls on physicians had been advising them that Materna was an inferior product because the iron in Materna could not be absorbed by the patient as well as iron in Stuartnatal.

This was so, it was said, because the calcium in Materna was calcium carbonate whereas Stuartnatal contained calcium sulfate. When Materna was absorbed in the stomach, it was alleged, the carbonate would dissociate from the calcium and the fumarate (a negative ion with the iron) would dissociate resulting in a complex that would precipitate, removing the iron from the solution so that it could not be absorbed.

Dr. Ellenbogen discounted the claim as theoretical, but he was trying to find a way to test and compare iron absorption from Materna and Stuartnatal to deflate Stuart's sales pitch. Dr. Allen advised that the gold standard was to incorporate a radioactive isotope of iron into a product administered to a test subject and then measure the radioactive count either in the body to determine the amount absorbed, or in the feces to determine the amount that had not been absorbed which was then subtracted from the amount administered to account for the amount absorbed. This technique, however, was not satisfactory for a number of reasons not the least of which was the risk inherent in exposing humans to radioactive isotopes.

Dr. Allen informed Dr. Ellenbogen of a 1976 article in the *Scandinavian Journal of Hematology* titled "Iron Absorption Studies" by Dr. Gunnar Ekenved which described a very high correlation between serum iron increase following ingestion and the amount of radioactive iron absorbed using the gold standard technique. Dr. Allen advised Dr. Ellenbogen that the serum iron technique to quantify iron absorption based on the Ek-

enved studies could be used to determine the accuracy of Stuart Pharmaceutical's claim.

Dr. Allen had learned of the Ekenved studies shortly after their publication when he was reading extensively in the field of iron absorption and hemochromatosis. At trial, Dr. Ellenbogen testified that he, too, knew of the Ekenved studies before Dr. Allen mentioned them in the early 1979 telephone conversation, but I find his testimony in this regard, as well as others, not credible.

### 4. The Studies.

Within a fortnight of their first telephone conversation regarding Materna, Dr. Allen and Dr. Ellenbogen spoke again. The two scientists agreed the iron absorption studies method could be used to test the relative absorption qualities of Materna and Stuartnatal without having to use radioactive iron. They discussed in detail how the study could be done and Dr. Ellenbogen said he had $5,000 in his budget to pay for the study. Although Dr. Allen said additional testing could be done to determine total iron binding capacity, Dr. Ellenbogen advised he was interested only in determining whether Materna provided the same iron absorption as Stuartnatal. He thought both products delivered adequate amounts of iron for prenatal subjects and didn't think there would be any significant difference between the two products. Accordingly, he wasn't interested in determining the milligrams of iron absorbed. Because the tests were limited to a comparison of the two products, Dr. Allen's recommendations to test for iron alone and to use a placebo were dropped. It was agreed that 16 normal females of child-bearing age would be the subjects of the study.

When they agreed on how a study would be done, Dr. Allen had not thought he would be the person conducting the study and when asked by Dr. Ellenbogen, he told him he would be unavailable due to other commitments. Dr. Ellenbogen then said he actually had a total of $10,000 in his budget for the study and that it was customary in the pharmaceutical industry to determine what the clinical studies would cost and then double that figure with the second half going to the investigator as an additional incentive. Dr. Ellenbogen said he trusted Dr. Allen's work

and urged him to perform the study. These factors, coupled with the fact that the tests were of scientific interest because they had never been done on prenatal vitamins, persuaded Dr. Allen to do the study.

Dr. Allen told Dr. Ellenbogen about Dr. Seligman, his colleague on the faculty whose special area of interest was iron, and said he would ask Dr. Seligman to assist. Dr. Ellenbogen agreed to draw up the protocol and Drs. Allen and Seligman to conduct the study.

When Dr. Ellenbogen called Dr. Allen and read his proposed protocol to him, Dr. Allen found the proposal unacceptable and dictated to Dr. Ellenbogen background information on the carbonate theory and how calcium carbonate might interfere with iron absorption, the details of how the subjects would be selected, the number and manner of obtaining the blood samples and how the iron would be assayed. Dr. Allen felt awkward dictating these changes and believed this conversation created a strain on his otherwise friendly relationship with Dr. Ellenbogen. In due course Dr. Ellenbogen mailed the revised protocol to Dr. Allen for written comment, however, and Dr. Allen replied that it was excellent.

Following University rules, Dr. Allen obtained clearance to conduct the tests from the Human Studies Committee. In July 1979 Dr. Ellenbogen sent a check for $5,000 made payable to Dr. Allen who did not cash it, but requested and received a new check which was payable in like amount to the Division of Hematology and deposited in its general account. This was the first half of the $10,000 to be paid for the contemplated single study. (Study I).

Dr. Ellenbogen made a pre-test visit to Denver to inspect the facilities and meet the personnel who would be involved in the study. "Sponsors," he stated, "must *always* do that to satisfy what is called good clinical practices that the FDA requires." (Emphasis added). Dr. Allen and his wife hosted a dinner party for Dr. Ellenbogen at their home after which Dr. Ellenbogen wrote a gracious appreciation letter for the hospitality extended to him and the two scientists continued their professional friendship discussing, among other topics, the iron absorp-

tion studies, intrinsic factor and vitamin B12 analogues.

Contrary to the expectations of Drs. Allen and Seligman that iron absorption from Materna would be worse than that obtained from Stuartnatal and Dr. Ellenbogen's expectation that absorption from both would be about the same and acceptable in either, the Study I results showed poor absorption from both products. While this result satisfied Lederle's marketing concerns because it deflated Stuart's sales pitch that Materna was inferior to Stuartnatal, it caused Drs. Allen and Seligman grave concern that pregnant women who used either product would not obtain the necessary iron for which the medication was prescribed. Therefore, they immediately recommended to Dr. Ellenbogen that a follow-up study be conducted to measure the absorption from a simple iron compound (ferrous fumarate), to establish a baseline for comparison against the Study I results.

Dr. Allen followed the Human Studies Committee's approval process and prepared another Subject Consent Form for the new study (hereafter, Study IA) Neither Dr. Ellenbogen nor anyone else at Cyanamid participated in preparing a protocol for Study IA, nor did Cyanamid send a check in payment as it did before Study I commenced. Dr. Ellenbogen did not make a visit before the study began. Drs. Allen and Seligman completed Study IA in September 1979 and Dr. Allen sent the results of Study IA to Dr. Ellenbogen. I find Study IA was undertaken and completed by Plaintiffs entirely independently of Cyanamid.

Study IA showed satisfactory absorption from the iron compound alone, validating Study I's conclusion that there was poor iron absorption from both Materna and Stuartnatal. After receiving the results of Study IA Dr. Ellenbogen initiated steps to obtain a grant of $5,000 which was awarded to Plaintiffs. At the conclusion of Study IA, although Cyanamid had noticed that Materna did not yield good iron absorption, it did not know the reasons therefor and Cyanamid did not inform physicians or the public about the results of either Studies I and IA. Moreover, Cyanamid, at that time, had no plan, theory

or formula to reformulate Materna to achieve improved iron absorption so as to approximate the amount of iron contained in its product.

In a letter to Dr. Allen dated October 5, 1979, Dr. Ellenbogen wrote, "I hope your studies are progressing well and we get some good clear results on the cause of reduced iron absorption." Dr. Ellenbogen did not recall whether he had any plan to do further studies on iron absorption after receiving the results of Study IA and did not believe that magnesium oxide and calcium carbonate would inhibit iron absorption.

Entirely independent of Cyanamid, Drs. Allen and Seligman devised a study to determine the reasons for the poor iron absorption of both Materna and Stuartnatal (hereafter Study II). Stuart's theory that calcium carbonate interfered with iron absorption because carbonate combined with the iron to form ferrous carbonate could explain the inadequate absorption of Materna, but it could not explain the inadequacy of Stuartnatal which had no carbonate in it. Both products, however, contained magnesium oxide. Therefore, Drs. Allen and Seligman designed Study II to determine whether both calcium carbonate and magnesium oxide interfered with iron absorption. They suspected the interference was caused by a combination of calcium and magnesium salts. As was the case with Study IA, Dr. Ellenbogen did not make a prestudy visit. With necessary University clearances, Drs. Allen and Seligman performed Study II in October and November 1979.

On December 4, 1979 Dr. Allen wrote to Dr. Ellenbogen and advised him of the results of Study II. The letter bears quotation:

> I believe that the results strongly indicate that magnesium oxide ... and calcium carbonate all decrease iron absorption in humans.... Based on the studies that we have performed to date, I believe that iron absorption from prenatal capsules could be increased markedly if calcium sulfate were used in place of calcium carbonate, if the amount of magnesium oxide was reduced or omitted entirely....

Even at this point there is no credible indication that Cyanamid had any reformulation of Materna in mind.

Although Study II established that both calcium carbonate and magnesium oxide interfered with iron absorption, the point at which the effect begins to occur was not determined. Therefore, from February 8 through 19, 1980, Drs. Allen and Seligman conducted Study IIA. This study was performed without a protocol from Cyanamid, without a prestudy visit by Dr. Ellenbogen and without any payment from Cyanamid in advance of the study.

In a March 4, 1980 letter Dr. Allen advised Dr. Ellenbogen of the results of Study IIA, which is the essence of the invention in question. The letter states:

> As we discussed, I believe that the next step would be for Lederle to reformulate their [sic] Materna preparation such that it contains 200 mg of calcium in the form of calcium carbonate and 25 mg of magnesium in the form of magnesium sulfate or magnesium oxide.... would expect that the absorption of iron from the new Materna would be similar to that of iron alone.

Two weeks after this letter, Dr. Ellenbogen prepared and sent a protocol for the already completed study to Dr. Allen. Cyanamid's in-house patent attorney Dr. Robert Raymond, who drafted the Patent, acknowledged the reformulation set forth in the foregoing letter is within the scope of the Patent later filed by Cyanamid. I find by clear and convincing evidence that the reformulation was the invention of Drs. Allen and Seligman and was communicated by Dr. Allen to Dr. Ellenbogen. I reject Dr. Ellenbogen's testimony to the contrary as not credible.

Dr. Ellenbogen thereafter asked Dr. Allen to perform another study (Study III) to measure iron absorption (1) from Stuartnatal, (2) from a formulation essentially the same as proposed by Dr. Allen (except that it included 250 rather than 200 mg. of calcium carbonate, but still within the scope of the Patent), and (3) from a formulation having 350 mg. of calcium carbonate. Each of the three formulations contained 25 mg. of magnesium oxide as recommended by Dr. Allen. Study III was performed in October 1980.

Cyanamid furnished a protocol for Study III and made a grant of $5,000 per composition for a total of $15,000. For the first time

since Study I, Dr. Ellenbogen made a prestudy visit to the Health Sciences Center. As predicted by Dr. Allen, Study III disclosed enhanced iron absorption from the 250 mg. formulation and poor iron absorption from the formulation containing 350 mg. of calcium carbonate.

The next study, in March 1981 (Study IV), compared the reformulation of Materna with Stuartnatal and several other competing products and revealed iron absorption from the reformulated Materna was enhanced just as Dr. Allen said it would be from essentially the same reformulation he had disclosed to Dr. Ellenbogen and recommended in his March 4, 1980 letter. For Study IV Dr. Ellenbogen made what he had proclaimed to be the obligatory prestudy visit to the Health Sciences Center to satisfy good clinical practices. Cyanamid paid $5,000 per composition for a total of $30,000 and Cyanamid furnished a protocol in advance of the study.

### 5. The Publications.

As part of their academic regimen Drs. Allen and Seligman prepared an article for publication in a medical journal describing their studies and the results thereof (the "Article"). The first draft was completed in 1981 after Studies I through IV were completed. Consistent with academic custom, Drs. Allen and Seligman named themselves and their laboratory assistants who participated in the studies as co-authors. They did not name or consider Dr. Ellenbogen a co-author. This draft was submitted on July 27, 1981 to The New England Journal of Medicine. (On this side of the Atlantic, at least, it is the ne plus ultra of medical journals. Dr. Allen had already published articles in it.)

In keeping with their relationship, Dr. Allen sent Dr. Ellenbogen a copy of the Article on a confidential basis. Dr. Ellenbogen had no comments or suggestions for changes on the draft submitted to the New England Journal of Medicine.

The New England Journal declined to publish the Article. Drs. Allen and Seligman made minor changes in the draft and sent it to the Journal of Obstetrics and Gynecology, which published it in its March 1983 issue under the title "Measurements of Iron Absorption from Prenatal Multivitamin–Mineral Supplements" Before publication, Dr. Allen sent a copy to Dr. Ellenbogen.

As is typical with professional journals of the sort described, the Journal of Obstetrics and Gynecology wrote to Dr. Allen accepting the Article for publication. The letter advised, "that prior publication of any portion of this article, including tables, figures or graphs, in other scientific journals or news media will void this publication agreement." Dr. Allen sent a copy of this letter to Dr. Ellenbogen. Later, Dr. Ellenbogen asked Dr. Allen for permission to order reprints of the published Article. I conclude based on the foregoing and the established relationship that Dr. Ellenbogen knew the Article, intended for The New England Journal of Medicine,—and specifically the tables, figures and graphs it contained—was confidential and that he was not to copy it in whole or in part or reveal any part of it without the express prior approval of Dr. Allen.

The focal point of scientific interest in the Article was Table I, which tabulated the results of Studies I, IA, II, III and IV. Table I presents the results of the studies in a distinctive format with four main columns, nine sub-columns and 12 rows. The results of these studies are presented in graph form in four figures.

### 6. The Patent.

Shortly after he received from Dr. Allen the draft of the Article submitted to The New England Journal of Medicine, Dr. Ellenbogen contacted Cyanamid's in-house patent department. Within weeks, the patent process was aweigh. The patent application copied information from the Article, replicated Table I and traced its four Figures.

The Cyanamid in-house patent counsel who prepared and filed the patent application, Dr. Raymond, knew that the studies were performed by Drs. Allen and Seligman. Dr. Ellenbogen, however, told Dr. Raymond that the role of Drs. Allen and Seligman was merely technical and either told, or led Dr. Raymond to believe, that it was he, Dr. Ellenbogen, who designed the Studies, that Cyanamid had paid Drs. Allen and Seligman for their work on all of the Studies and that Dr. Allen was merely performing tests on materials provided to him under protocols

prepared by Dr. Ellenbogen. This understanding of Dr. Raymond was flatly incorrect. Moreover, had Dr. Raymond been advised of the true facts, he would not have listed Dr. Ellenbogen as the inventor on the patent application as he did.

In August 1981 Dr. Ellenbogen filled out a Cyanamid company form called a "Record of Invention." This form contained a line for insertion of the date of conception of the invention. Cyanamid's internal document control policy provides that a Record of Invention form must be maintained in two separate places for the "*life* of the company." (emphasis in original.) The record of invention form completed by Dr. Ellenbogen is missing from both places where it was to be maintained and no copy has been located anywhere else. Dr. Ellenbogen testified that he does not remember the date he entered for the date of conception on the form.

On October 14, 1981 Cyanamid held a press conference and issued press releases describing the studies conducted by Drs. Allen and Seligman and announcing the reformulation of Materna. Dr. Allen attended the press conference and presented the studies and reformulation, but was not informed by anyone connected with Cyanamid that the company was preparing and intended to file a patent application on his and Dr. Seligman's invention.

The patent application was filed with the federal Patent and Trade Office on or about December 21, 1981, listing Dr. Ellenbogen as the sole inventor and containing Dr. Ellenbogen's oath stating he was the inventor. The Patent issued as U.S. Patent No. 4,431,634 in February 1984. Shortly thereafter Cyanamid gave Dr. Ellenbogen an award for being the inventor. Contrary to the established routines of their friendship, Dr. Ellenbogen did not advise Dr. Allen of his award, the issuance of the Patent or his listing on the application as the inventor. Dr. Allen did not learn about the Patent until June 1993.[1]

### 7. *The Continuing Relationship.*

In October 1982 at a meeting in San Francisco of the International Society of Obstetrics and Gynecology, Dr. Seligman made an oral presentation accompanied by posters. Dr. Ellenbogen attended the event and he and Dr. Seligman had a series of conversations. On the second night of the meeting, they went to Chinatown for dinner. Dr. Seligman complained that he was bored and wished Dr. Allen had told him how long he would need to stay at the meeting. Dr. Ellenbogen criticized Dr. Allen by saying he had helped Dr. Allen on a number of occasions and complaining, "It would have been nice if he could have helped me out. I should have been on the manuscript." Dr. Seligman replied, "It sounds like you've got some issues with Bob (Dr. Allen), and you should just give him a call." Dr. Ellenbogen mentioned that he had some patents and that Dr. Allen wasn't the only one who knew about patents. Dr. Ellenbogen, however, did not mention the Materna patent to Dr. Seligman.

By a letter dated October 5, 1984, Dr. Ellenbogen told Dr. Allen Cyanamid wanted to conduct a comparison study of iron absorption from reformulated Materna with that from Pramilet FA, a competing product. Pramilet included, *inter alia*, 250 mg. of calcium in the form of calcium carbonate and 10 mg. of magnesium in the form of magnesium oxide, having been so formulated since as early as 1979. Dr. Ellenbogen said he hoped to draft the protocol for the study in the near future and suggested it would be helpful if Dr. Allen could receive approval from the University before Dr. Ellenbogen forwarded the protocol.

Dr. Allen signed the Human Subject Committee form for the Pramilet study on November 7, 1984 and the University granted its approval on November 16, 1984. Dr. Ellenbogen sent the protocol for the Pramilet study to Dr. Allen on December 13, 1984 and Dr. Allen signed and returned it on December 28, 1984. Cyanamid paid a total of $15,000 for this study, half of it ($7,500) in January 1985.

On January 14, 1985 Cyanamid shipped bottles of Pramilet and Materna to Dr. Allen for his use in the Pramilet study. The labels on those bottles were covered with another

---

1. On October 21, 1981, Dr. Ellenbogen told Dr. Allen about an entirely different patent, but not the one at issue in this case.

label marked *"FOR INVESTIGATIONAL USE ONLY"* so that the patent notice was masked. The results of the Pramilet study were sent to Cyanamid on February 26, 1985, and the University received final payment on May 22, 1985.

### 8. *The Discovery.*

In June 1993 Dr. Seligman received a letter from Barbara D'Alonzo, Senior Coordinator of Special Projects, Marketing Services Department of Wyeth–Ayerst Laboratories requesting permission to use and purchase reprints of the article, "Measurements of Iron Absorption from Prenatal Multivitamin–Mineral Supplements" which had appeared in the 1983 issue of *Obstetrics & Gynecology*. She indicated Wyeth–Ayerst intended to use the reprints for informing its sales representatives and its Medical and Medical Communications departments. She requested Dr. Seligman to send her a letter addressed to the editor of *Obstetrics & Gynecology* giving Wyeth–Ayerst copyright permission so it could be included in the purchase order.

At Dr. Allen's suggestion Dr. Seligman contacted Dr. Ellenbogen to see if he could tell them why Wyeth–Ayerst would want such a letter and what that company was doing in the area of prenatal vitamins. Dr. Seligman faxed the letter to Dr. Ellenbogen and a few days later Dr. Ellenbogen called Dr. Seligman and told him Wyeth–Ayerst had acquired Stuartnatal. Dr. Ellenbogen recapitulated his surprise and concern that people at Wyeth–Ayerst "would be looking at your manuscript." He said, "I can't imagine what they want to do with it, if it's Stuartnatal, but I was concerned about something that might be related to Materna, and we've got a patent on that." Dr. Seligman describes this statement as being followed by a brief, pregnant pause and Dr. Ellenbogen immediately changing the subject to their families. Dr. Seligman remembers the conversation vividly because at that time he and his wife were expecting their third child and were gravely concerned about the possibilities of the child being born with Down's Syndrome. Shortly afterward, Dr. Seligman told Dr. Allen that Dr. Ellenbogen had mentioned something unusual about a patent related to the manuscript. Dr. Seligman's comprehension had been distracted by the change of subject to the impending birth.

He said to Dr. Allen, "I don't know if Materna was used, but it was something. He was worried, but he's not worried anymore, and it was Stuartnatal." Dr. Allen then checked into the existence of a patent, learned there indeed was one and ordered a copy of it. When the Patent was received and examined by Drs. Allen and Seligman, they were both shocked to learn that the figures in the Patent had been lifted, indeed traced, from their *New England Journal* manuscript. Dr. Seligman exclaimed, "What a sleaze!" I find in this recounting, and in all other respects, that Dr. Seligman is a completely credible and persuasive witness.

No one connected with Cyanamid ever mentioned to Dr. Allen, Dr. Seligman or the other Plaintiffs the unauthorized use of the data and table in the Article, the prosecution of the Patent, the preparation and filing of an affidavit in support of the patentability of the invention averring that Dr. Ellenbogen instigated and supervised all the Studies, the issuance of the Patent, the award to Dr. Ellenbogen for being named as inventor on the Patent, or the six civil actions asserting the Patent brought by Cyanamid against generic drug companies.

### 9. *The Benefits.*

After the Patent issued, Cyanamid brought six patent infringement actions against generic drug manufacturers. Each case settled by a stipulated injunction prohibiting further infringement of the Patent. As a result, Cyanamid had no generic competition from 1984 to the filing of this case. The other name brand prenatal vitamin did have generic drug company competition.

In 1980 University Patents, Inc. had a contract with the. University of Colorado to license University inventions to third parties so the University would receive royalties. In that year, University Patents wrote to Dr. Ellenbogen requesting Cyanamid to execute a Confidential Disclosure Agreement so University Patents could disclose another of Dr. Allen's inventions to Cyanamid. That Confidential Disclosure Agreement stated the invention being disclosed belonged to the University and that University Patents was the University's "technology transfer manager".

Dr. Raymond reviewed the Confidential Disclosure Agreement for Cyanamid. In August 1981 University Patents sent another letter to Dr. Ellenbogen enclosing a copy of a patent application on one of Dr. Allen's inventions and stating that the disclosure was made pursuant to the previously described Confidential Disclosure Agreement. The first written communication between Dr. Ellenbogen and Dr. Raymond concerning patenting the Materna reformulation occurred three days after that letter.

10. *The University and its Patent Policy.*

On December 15, 1977 the Regents approved the "Text Of A Revised Policy On Patents" (the "Policy"). This Policy called for the establishment of a patent committee for the University, which was charged to suggest to the President of the University commercial potentials of discoveries and "make recommendations as to whether such discoveries might be patentable, licensable and/or otherwise commercially developable."

The Policy required the President of the University, "upon recommendation of the Patent Committee," to designate a patent officer to be responsible for the day-to-day administration of the Policy. The patent officer was authorized to take certain steps in connection with the commercial exploitation of discoveries in which the University had an interest. The Policy is not a self-executing assignment of rights from an inventor to the University or its designee. Rather, each "included person" becomes obligated to assign any and all rights to the University when that person is aware of the need to do so.

Under the Policy, the term "included persons" refers to "all faculty members, fellows and staff employees" and the term "discoveries in which the University has an interest" includes "discoveries made while performing duties required by a third-party grant or contract and/or made with the use of University facilities and/or made as a result of the use of funds supplies [sic] or administered by the University."

Drs. Allen and Seligman were and remain "included persons" subject to the Policy at all relevant times. Because Drs. Allen and Seligman invented the Materna reformulation, it is a "discovery in which the University has an interest." The doctors were and are required under the Policy to file a written report "within a reasonable time after the discovery is made and no later than its submission for publication." The University considers this reporting obligation a matter of critical importance. The University's publication, "A Guide to the Law of Patents for Scholars" states "[p]ublication of research results can proceed on a normal basis and patent rights can be preserved if the investigator submits a disclosure of his or her invention in a timely manner."

Neither Dr. Allen nor Dr. Seligman submitted the written disclosure mandated by the Policy. It is obvious why the doctors did not comply with their employer's policy in this instance, when Dr. Allen had with respect to other inventions: whilst Drs. Allen and Seligman are the inventors, it did not occur to them to take action independent of Cyanamid to determine whether their invention was patentable. When, however, the doctors discovered that Cyanamid had obtained a patent for the reformulation without naming them as the inventors, they did take immediate action which was entirely consistent with the Policy.

The University bases its interest in the invention on rights granted to it under the Policy. Dr. Ellenbogen, Dr. Raymond and thus Cyanamid were well-advised of the Policy. There is no controversy between the University and the doctors that would redound to the benefit of Cyanamid. The pivotal fact is that Dr. Ellenbogen claimed credit with his employer for an invention which was not his. Dr. Raymond prepared and filed the patent application not knowing that Drs. Allen and Seligman were the inventors. Perforce, this litigation would not have ensued.

On July 31, 1985 the Regents and the Foundation executed a servicing agreement by which the University assigned to the Foundation "its entire right, title and interest in and to all rights to inventions, discoveries and other intellectual property in which it has an interest." The agreement also provided for the establishment of a University Committee on Intellectual Property to replace the Patent Committee specified in the Policy. The effect of the servicing agree-

ment was to transfer from the University to the Foundation any rights or interests it might acquire to inventions.

On August 1, 1993 the Foundation and University Patents executed a Recovery–Sharing Agreement by which University Patents assigned to the Foundation "any and all rights and claims it may have to [the Patent] ... and against Lederle or any other third party regarding such patent or the invention covered by such patent." In return, the Foundation agreed to pay to University Patents 18.2% of all amounts collected as a result of the claims against Cyanamid if this action settled after commencement of the trial. University Patents agreed to cooperate with Plaintiffs.

The purpose of the Recovery–Sharing Agreement was to resolve any claims University Patents may have had as a result of the invention made, but not reported, during the pendency of the 1976 Servicing Agreement. After this action was filed, the doctors also assigned their rights to the invention to the Foundation.

### 11. *The Damages.*

Plaintiffs claim Cyanamid's fraud cost them the opportunity to benefit financially from the reformulation. According to Plaintiffs, a conservative approach to measuring their damages under their copyright, fraud and unjust enrichment theories is the value of the reasonable royalty they would have negotiated for an assignment or the exclusive licensing of the Patent to Cyanamid had they known of the patent application. To that amount would be added that portion of Cyanamid's profits that Plaintiffs would have received but for Cyanamid's fraud.

The evidence relating to damages under Plaintiffs' theories of relief is scant. There was no evidence attempting to quantify Cyanamid's profits or to distinguish among those profits attributable to the Patent, the copyright infringement, or otherwise, nor was any accounting performed or requested. Instead, the evidence regarding damages focused almost exclusively on the reasonable royalty Plaintiffs claim they would have negotiated with Cyanamid had they known of the plans to patent the reformulation.

Plaintiffs' expert testified that a reasonable royalty in the pharmaceutical industry dur-

ing the relevant time period would have been 10% of Cyanamid's net sales of Materna, with an additional 1% to 2% of net sales if the license were exclusive and contained no initial payment. The expert relied on data summarized in several charts showing Materna's net sales from 1982 through 1995, projections of sales through the life of the Patent assuming proper patent enforcement and marketing of the Patent, and reasonable royalty fees based on those figures. The chart detailing Plaintiffs' actual damages, assuming a 12% royalty rate on Cyanamid's aggregate sales and an 8% statutory interest rate, is replicated in its entirety as Appendix 1 to this decision. The chart shows an aggregate amount of actual damages accrued through the life of the Patent to be $44,396,159. Cyanamid offered no evidence to dispute or contravene the expert's testimony or the sales figures upon which he relied, and I find them credible.

### B. *Conclusions of Law.*

Applying these findings of fact to the applicable legal standards as I interpret them, I reach the following conclusions of law:

#### 1. *Standing.*

Cyanamid contends the University, the Regents and the Foundation lack standing to assert their claims for fraud and unjust enrichment because Drs. Allen and Seligman did not assign their purported rights to the invention to the University as required by the Policy. Cyanamid relies on *Arachnid, Inc. v. Merit Indus., Inc.,* 939 F.2d 1574 (Fed.Cir.1991), a patent case in which plaintiff was deemed to lack standing to sue for an infringement that occurred before plaintiff had obtained legal title to the patent under an agreement it executed with a consultant inventor. The *Arachnid* court found the agreement, which provided that any inventions conceived during the consultancy would be the property of plaintiff and "will be assigned" by the consultant to plaintiff, was merely "an agreement to assign" and did not, by itself, transfer patent rights to the plaintiff. *id.* at 1576, 1580.

Borrowing the *Arachnid* analysis, Cyanamid contends Plaintiffs lack standing to pursue their claims because Drs. Allen and Seligman did not comply with the Policy to

assign their rights to their reformulation studies to the University until after this lawsuit was filed. I find *Arachnid* inapplicable and conclude the University, the Regents and the Foundation have standing to pursue common law claims against Cyanamid.

█ The standing requirement for a patent infringement claim is significantly higher than the standing necessary to state a claim under common law. This is because a patent gives an inventor greater rights to make, use or sell the invention than does the mere act of invention. *Arachnid*, 939 F.2d at 1578. The act of invention vests the inventor with a common law right to make, use or sell his invention while a patent vests the inventor with "the right to *exclude others*" from doing so. *Id.* (emphasis original). To enforce the greater patent right, "a plaintiff must necessarily have standing as comprehended by the patent statute." *Id.* at 1579.

No claim for patent infringement remains. Any assertion that the University, the Regents or the Foundation must prove standing "as comprehended by the patent statute" to perfect a common law claim for relief against Cyanamid is contrary to *Arachnid* and is rejected.

### 2. *Fraud.*

█ Plaintiffs assert Cyanamid is liable under a theory of fraudulent nondisclosure for concealing the existence of the Materna patent and depriving them of the money they would have received had they been given the opportunity to use their reformulation invention commercially. Under Colorado law, the elements of a claim for fraudulent nondisclosure are: (1) concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages. *Kopeikin v. Merchants Mtg. & Trust Corp.*, 679 P.2d 599, 601 (Colo.1984) (en banc) (restating standard articulated in leading case of *Morrison v. Goodspeed*, 100 Colo. 470, 68 P.2d 458 (1937)).

I have already found that Dr. Ellenbogen did not invent the Materna reformulation and that the true inventors were Drs. Allen and Seligman.[2] Given the long-standing friendship between Dr. Ellenbogen and Dr. Allen, and the confidential working relationship between Cyanamid and the University doctors, the filing of the patent application was a material fact that in equity and good conscience should have been disclosed. This is so regardless of who was named as the inventor: the fact that Dr. Ellenbogen was named only underscores the fraudulent nature of the nondisclosure, perhaps explaining the motivation behind it.

I find Dr. Ellenbogen deliberately concealed the application so that lie could continue the beneficial relationship with Dr. Allen, while retaining for Cyanamid the financial and competitive benefits of the doctors' reformulation idea and for himself recognition and reward from his employer. Drs. Allen and Seligman acted on this concealment by continuing to work for and benefit Cyanamid, unaware that their idea had been appropriated and Cyanamid was attempting to exclude them and others from being able to use it in the future. They acted on the concealment by failing to seek to have their names included in the application or to prevent the issuance of the Patent in Dr. Ellenbogen's name. The concealment deprived the University and the Foundation of financial opportunities and prestige they would have enjoyed had their doctors been credited with the invention, and harmed Drs. Allen and Seligman both personally and professionally.

**2.** Both sides spent significant time in their briefs and arguments debating the question of who invented the reformulation at issue as that term is defined in the patent statute. As I explain in the section of this opinion dealing with Cyanamid's affirmative defenses, Plaintiffs are not required to establish inventorship or ownership under the patent statute to state a common law claim for fraud or unjust enrichment. As set forth above, a higher level of inventorship or ownership is required to state a claim for patent infringement. We are no longer concerned in this case with inventorship for the purposes of the Patent Act, as Plaintiffs' claim for infringement has been denied as a matter of law. We are concerned with the act of invention itself and the common law right to make, use or sell the invention that flows from it. I have determined that the act of inventorship in this case was that of the doctors, not Dr. Ellenbogen.

The doctors' failure to discover the fraud or to act to prevent or redress it was a result of the fraud itself and was justified under the circumstances. It was not attributable to any lack of diligence on their part or on the part of the University.

■ Cyanamid is liable for its own misconduct and is vicariously liable for that of Dr. Ellenbogen. Dr. Ellenbogen was acting at all times relevant to Plaintiffs' claims on Cyanamid's behalf and with its apparent authority. *See Grease Monkey Int'l, Inc. v. Montoya,* 904 P.2d 468, 473 (Colo.1995) (en banc) (citing Restatement (Second) of Agency § 257). Drs. Allen and Seligman, the University and the Foundation were injured as a result of this fraud and are entitled to relief.

### 3. *Unjust Enrichment.*

■ Cyanamid argues the claim for unjust enrichment must fail because Plaintiffs neither desired nor expected to be compensated for the Studies or for Cyanamid's use of the Studies to produce and market a reformulated Materna product. According to Cyanamid, Drs. Allen and Seligman shared the results of the Studies freely, encouraged Cyanamid to market the reformulated Materna product and sought no financial compensation in connection with its commercial distribution. Under such circumstances, Cyanamid asserts "any benefit realized by Cyanamid from such commercialization, whether from the sale of the reformulated product, the issuance of the Patent or otherwise, cannot serve as the basis for a claim of unjust enrichment." Def.'s Trial Br. at 49 (emphasis added). I disagree.

Cyanamid misapprehends the nature of the unjust enrichment claim. The benefit at issue was not the use of the doctors' Studies and reformulation to make and market a reformulated Materna product. Rather, the benefit was the use of the doctors' Studies to claim credit for inventing the reformulation and to obtain a patent on it. The Patent allowed Cyanamid to assume ownership of the reformulation and to obtain monopoly profits by excluding others, including the doctors, from using or sharing it again.

So understood, the doctors' expectation of compensation (or lack thereof) for Cyanam-

id's pre-Patent use of the reformulation itself is immaterial. That the doctors did not expect to be paid for the reformulation's pre-Patent use does not mean they consented to Cyanamid's appropriation of their idea or are without a remedy for the very different benefits conferred.

To the extent the benefit at issue is the Patent, Cyanamid asserts Cyanamid could not have conferred such a benefit on it because only the Patent and Trade Office has authority to issue patents. Further, and because the Patent and Trade Office can only issue patents in favor of the true inventor, the "sole consequence" of any ruling that Drs. Allen and Seligman were the true inventors "would be the invalidation of the Cyanamid patent," not a claim for unjust enrichment. See Def.'s Trial Br. at 53–54. Cyanamid's arguments harken to the protruded tongues of playground taunts and are utterly unpersuasive. Such casuistry ignores the venerable role of equity in our courts and the nature of a claim for unjust enrichment.

■ Unjust enrichment is an equitable doctrine that permits recovery when a plaintiff shows " ' (1) that a benefit was conferred on the defendant by the plaintiff, (2) that the benefit was appreciated by the defendant, and (3) that the benefit was accepted by the defendant under such circumstances that it would be inequitable for it to be retained without payment.' " *Ninth Dist. Prod. Credit Ass'n v. Ed Duggan, Inc.,* 821 P.2d 788, 795 (Colo.1991) (en banc) (quoting *Cablevision of Breckenridge v. Tannhauser Condominium Ass'n,* 649 P.2d 1093, 1096–97 (Colo. 1982)). The scope of the remedy for unjust enrichment is broad, centering attention " 'on the prevention of injustice.' " Id. (quoting Palmer, Law of Restitution § 1.1 (1978)).

■ I conclude that a benefit was conferred on Cyanamid by Plaintiffs and that Cyanamid appreciated this benefit. Cyanamid used the Studies to obtain a patent on the doctors' original idea for the reformulation and deliberately concealed its actions. The Patent allowed Cyanamid to exclude generic manufacturers from the prenatal vitamin market and to obtain a higher price for its product than it could have without it. "A

person confers a benefit upon another if he . . . in any way adds to the other's security or advantage." Restatement of Restitution § 1, comm. b (1937). The definition of benefit contained in the Restatement is broad, *Cablevision*, 649 P.2d at 1097, and includes the profits and other advantages Cyanamid gained by patenting Plaintiffs' invention.[3]

The circumstances under which Cyanamid obtained this advantage make it inequitable for Cyanamid to continue enjoying it without compensating Plaintiffs.

### 4. *Cyanamid's Affirmative Defenses.*

Cyanamid asserts a panoply of affirmative defenses to Plaintiffs' claims, each of which I find unpersuasive.

■ Cyanamid asserts the claims of Drs. Allen and Seligman are barred by statutes of limitations, and that the claim for unjust enrichment is also barred by the equitable doctrine of laches. I reject both assertions based on my finding that the failure of Drs. Allen and Seligman to file their claims within the applicable limitations periods was the result of the very conduct for which relief is sought, namely the fraudulent concealment of the fact of the patent application and the naming of Dr. Ellenbogen as the reformulation's inventor.

Cyanamid is prohibited from invoking the doctors' reliance on its fraud to raise a procedural bar to a claim seeking a remedy for the fraud itself. Doing so would allow Cyanamid to benefit from its own misconduct in violation of established Colorado law. *See, e.g., Rosane v. Senger*, 112 Colo. 363, 149 P.2d 372, 375 (1944) (articulating common law concept that a wrongdoer should not be able to take advantage of his own wrong), *applied in Smith v. Boyett*, 908 P.2d 508, 512 (Colo. 1995) (en banc); *First Interstate Bank v. Piper Aircraft Corp.*, 744 P.2d 1197, 1200 (Colo.1987) (recognizing fraudulent concealment as basis for tolling statutes of limitation)

The defense of laches is rejected under the analogous equitable doctrine of unclean hands.

■ I also reject Cyanamid's defense based on Rule 12(b)(6) that Plaintiffs cannot prove they suffered harm as a result of Cyanamid's conduct. Cyanamid contends Plaintiffs are precluded from establishing this necessary element of their fraud and unjust enrichment claims because Drs. Allen and Seligman (1) "neither desired nor expected to benefit financially" from the invention and, instead, (2) "inten[ded] for all manufacturers of prenatal multivitamin supplements to use the invention free of charge." Pretrial Order (Statement of Claims and Defenses), p. 4. Again, these statements do not support a conclusion that Plaintiffs were not harmed by Cyanamid's simultaneous covert actions of claiming credit for the invention and securing for itself the exclusive right to market and profit from it.

As explained in *Arachnid*, a patent enlarges the " 'natural' right" of an inventor "to make, use and sell [his] invention" by "adding to it the *right to exclude others* from making, using or selling the patented invention." 939 F.2d at 1578 (emphasis original). When Cyanamid patented the reformulation, it secured for itself the exclusive right to make, use and sell, and therefore to profit from, it. Once this was accomplished, the doctors' original intent to share their invention and to forego any financial benefit from it was thwarted and cannot be used to defeat a claim based on the later, or then undiscovered, misconduct.

Cyanamid thwarted the doctors' original intent through fraud under circumstances where retention of the benefits of such fraud would be unjust. Therefore, it cannot now point to this original intent to argue the doctors were not harmed by Cyanamid's intervening misconduct. Doing so is akin to

---

**3.** Cyanamid contends there is no legal basis for awarding Plaintiffs any share of Cyanamid's post-Patent profits. Cyanamid asserts it began selling reformulated Materna before it obtained the Patent and did not need the Patent to continue doing so. Because it would have generated its profits even without the Patent, Cyanamid concludes Plaintiffs are not entitled to any share of them.

The argument is unpersuasive. Clearly Cyanamid perceived a benefit to patenting the reformulation or it would not have incurred the time and expense to do so. Among the benefits, Cyanamid was able to exclude generic drug companies from competition.

denying the victim of theft a remedy because the item stolen was originally intended as a gift for someone else.

■ Finally, Cyanamid contends Plaintiffs' claims are preempted by the Supremacy Clause of the United States Constitution because they are an attempt to obtain patent remedies in the absence of a patent. Quoting *Darling v. Standard Alaska Prod. Co.,* 818 P.2d 677 (Alaska 1991), *cert. denied,* 502 U.S. 1097, 112 S.Ct. 1176, 117 L.Ed.2d 421 (1992), Cyanamid asserts the "enforcement of [Plaintiffs'] unjust enrichment claim would clearly hamper free exploitation of ideas which are in the public domain, without affecting the existing incentives inventors have for disclosure." Def's Trial Br. at p. 62.

The distinction between the instant case and *Darling* is obvious. In *Darling,* the defendants copied samples of an invention that plaintiff sold to them in an arms-length transaction after plaintiff had unsuccessfully sought to patent the invention. Finding the invention to have been in the public domain at the time it was copied, the *Darling* court determined "[d]efendants received nothing more than that which they were legally entitled to use [and] were not unjustly enriched." 818 P.2d at 679 n. 4. Under these circumstances, plaintiff was seeking in equity that which he could not obtain under the patent laws, namely, the royalty or profit to which he would have been entitled had his attempt to patent his invention been successful. Accordingly, his claim was preempted under the Supremacy Clause.

In the instant case, by contrast, Cyanamid did much more than simply use and market an idea that was in the public domain: Cyanamid patented it. Relying on stealth and deception to claim credit for the reformulation, Cyanamid obtained a patent to exclude others from using the reformulation and to secure for itself monopoly profits for its manufacture and sale. In doing so, it removed the reformulation from the free marketplace of ideas in direct contravention of the wishes of those who invented it. This is categorically different from defendant's conduct in *Darling,* which had no effect on the ability of others to copy and use an invention that remained, after defendants' use, in the free marketplace of ideas.

The facts that the Patent was obtained, and that Cyanamid used fraud in obtaining it, distinguish this case from *Darling* and render the Supremacy Clause inapplicable.

5. *Damages—Copyright Infringement.*

■ I have already determined on summary judgment that Plaintiffs have satisfied the requisite elements of their copyright cause of action as a matter of law. In *Cyanamid I,* 880 F.Supp. at 1403, *mot. recons. denied, Cyanamid II,* 902 F.Supp. at 224, I found Figures 1–4 and Table 1 of the Article constituted copyrightable subject matter entitled to protection, and determined Cyanamid unlawfully copied the Figures and Table into its patent application. *Cyanamid I* at 1402. Left for resolution at trial, however, was the question of whether Plaintiffs could show damages related to the infringement.

The copyright Act provides that the copyright owner is entitled to recover both "the actual damages" suffered as a result of the infringement "and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(a)(1). According to the legislative history, damages are awarded to compensate the copyright owner for losses from the infringement and profits are awarded to prevent the infringer from unfairly benefiting from a wrongful act. See Notes of Committee on the Judiciary, H.R. No. 94–1476 (set forth in the Historical and Statutory Notes at 17 U.S.C.S. § 504).

As actual damages for Cyanamid's copyright infringement, Plaintiffs seek an amount equal to what they "would have agreed to as a fair price for licensing the reformulation to Defendant." Pls.' Trial Br. on Damages, p. 4. In addition, and even in the absence of any actual damages, Plaintiffs claim they are entitled to those post-Patent profits of Cyanamid attributable to the infringement. *Id.,* p. 5.

Plaintiffs' damages theory is problematic in the copyright context because it is the depiction of data, not the data itself, that is protected by the Act. Accordingly, Plaintiffs are entitled only to those damages and profits attributable to copying the Figures and Table into the patent application, not the reformulation depicted by them. Plaintiffs made no effort at trial to distinguish between

damages attributable to the infringement and those attributable to the Patent itself.

Given this failure, and the fact Plaintiffs did not elect to recover an award of statutory damages under 17 U.S.C. § 504(c), I decline to award them either damages or profits under the Copyright Act. In doing so, I note the Act's stated purpose of "prevent[ing] the infringer from unfairly benefiting from a wrongful act" should be realized in this case through the award of damages for Plaintiffs' common law claims of fraud and unjust enrichment.

### 6. *Damages—Fraud and Unjust Enrichment.*

I have determined that Cyanamid is liable to Plaintiffs both for fraud and for unjust enrichment. Devising an appropriate remedy based on the evidence presented at trial, however, has proved problematic. The difficulty stems from the conflict between the law of tort and of restitution, and the continuing debate on whether both legal and equitable relief is available for a single set of wrongs.

While I offer some observations on this conflict below, I conclude the dilemma is of little practical importance in this case. Plaintiffs' theory of damages is the same under both claims: Plaintiffs claim they were damaged by the amount they would have been able to obtain from Cyanamid as a reasonable royalty or licensing fee and Cyanamid was benefitted by its misconduct in the same amount. Although Plaintiffs purport to seek a share of Cyanamid's profits in the form of a disgorgement, they have offered no evidence as to what those profits, or their share of them, might be.

### a. *Fraud*

■ With respect to Plaintiffs' claim for fraud, I have already determined that Cyanamid copied the doctors' idea for the reformulation into their patent application; misrepresented that it was Dr. Ellenbogen, not the doctors, who invented the reformulation; concealed the application and the misrepresentation from the doctors and the University; and then concealed the fact that it had obtained and was enforcing exclusive rights to the idea. In short, Cyanamid defrauded the doctors of their idea, making that idea its own.

That idea, regardless of the doctors' original intent to give it away for free, belonged to them and their employer and had valued. The loss of this value is an element of actual damage for which Plaintiffs are entitled to be compensated.

The only evidence presented at trial attempting to quantify this loss was Plaintiffs' tables and expert testimony projecting Cyanamid's net sales of reformulated Materna through the life of the Patent and identifying the reasonable royalty Plaintiffs could have expected had they assigned or transferred exclusive rights to the reformulation to Cyanamid. Cyanamid offered no evidence to dispute the sales figures or the royalty calculations, and I accept them as fact.

I find Plaintiffs' reasonable royalty calculation—figured as a 12% share of Cyanamid's annual Materna sales through the life of the Patent—to be an appropriate measure of the stolen idea's value.

■ In addition to these actual damages for Cyanamid's fraud, I find Drs. Allen and Seligman are individually entitled to an award of punitive damages. Dr. Ellenbogen and Cyanamid betrayed the doctors' trust and exploited their work for pecuniary gain. Although we will never know the complete scope of the effect this had on the doctors' careers and life paths, I find beyond a reasonable doubt that Cyanamid's actions were "attended by circumstances of fraud, malice, or willful and wanton conduct" such that: Drs. Allen and Seligman are entitled to an award of reasonable punitive damages pursuant to Colo.Rev.Stat. § 13–21–102(1)(a).

In awarding exemplary damages to Drs. Allen and Seligman, I am perforce drawing a distinction between them and the institutional plaintiffs. The University and the Foundation have an interest in the doctors' invention and this interest was unequivocally known to Cyanamid. Indeed the Policy was specifically brought to Cyanamid's attention just three days before Dr. Ellenbogen contacted Dr. Raymond about patenting the Materna reformulation.

■ Under Colorado law, a trier of fact, whether judge or jury, is vested with the discretion to allow or deny exemplary

damages. *Sanders v. Knapp,* 674 P.2d 385, 388 (Colo.App.1983). I am mindful that exemplary damages are not intended to compensate an injured plaintiff, but to punish the defendant and to deter others from similar conduct. *Leidholt v. District Court,* 619 P.2d 768, 770 (Colo.1980). Moreover, Colorado courts have observed that the statute authorizing the award of exemplary damages reflects the General Assembly's intent to require a minimum degree of civility so that recourse to more violent methods is not taken by its defrauded citizens. *Mailloux v. Bradley,* 643 P.2d 797, 799 (Colo.App.1982).

It is fair game to be outsmarted in a business transaction, but not to be defrauded. The law marks the boundaries between the two; one is fair and the other is foul. Not every case entitling a plaintiff to actual damages for fraud, however, entitles one to an award of exemplary damages. The statute is aimed at the circumstances surrounding or attendant upon the fraud. In this case those circumstances relate directly to the rights of the doctors whereas the rights of the institutional plaintiffs are essentially derivative.

Cyanamid is a leviathan in an industry that depends upon scientific research. Its employee, Dr. Ellenbogen, is a scientist himself. Every scientist knows that imagination, insight and invention are at the very heart of this endeavor and must be respected if research is to survive at all. The imagination, insight and invention in this case were manifested by Dr. Allen and Dr. Seligman.

Cyanamid wantonly disregarded the integrity of the doctors' research—not just through Dr. Ellenbogen's deception and clandestine conduct, but through Cyanamid's failure to establish procedures to prevent such exploitation and to enforce the meager measures it had in place. Cyanamid's indifference and its consequent injury to the fragile nature of the creative process in scientific research cannot go unnoticed or unpunished.

There is no matrix for exemplary damages, nor do they have a defined, precise relationship to actual damages. In determining the amount of exemplary damages to be awarded Dr. Allen and Dr. Seligman, I am not basing that award on the enormity of the actual damage sustained by all Plaintiffs nor the relationship of the doctors to the other plaintiffs. Rather, I base it on Cyanamid's cynical disregard of these doctors as scientists. Its only concern in initiating the research on prenatal vitamins was to deflate the puff of a competitor. On the contrary, these physicians were dedicated to solving a problem that constituted a serious threat to the health of pregnant women so dedicated that they continued the research on their own. When Cyanamid recognized the profit that could be made, it pillaged the doctors' invention as so much booty. This conduct is not merely a question of stepping over the line; it is a departure from the game itself. The amount of the reasonable punitive damages awarded each is $500,000.

### b. *Unjust Enrichment*

The scope of the remedy for unjust enrichment "is broad, cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another." *Cablevision,* 649 P.2d at 1097 (citing 1 G. Palmer, The Law of Restitution § 1.1 (1978) and 66 Am.Jur.2d Restitution and Implied Contracts § 11). Simply applying the principle of unjust enrichment to the facts presented, I have concluded that the benefits realized by Cyanamid include Cyanamid's post-Patent profits attributable to the Patent, as well as any other industry or market advantages Cyanamid gained as a result of having the Patent. To prevent the injustice that would result if Cyanamid were permitted to retain these ill-gotten gains, the law of restitution would require me to order Cyanamid to disgorge them.

However, my earlier determination that Plaintiffs are entitled to an award of damages for fraud gives rise to the dilemma to which I alluded above: Where a plaintiff is awarded damages to compensate him for a loss but the loss is different from the benefit received by defendant, must the defendant also disgorge that benefit?

In general, civil law organizes and conceptualizes wrongs in terms of the harms they cause the plaintiff rather than the benefits they generate for the defendant, seeking to

remedy wrongs by compensating for injuries rather than requiring the wrongdoer to give up the benefits of his misdeed. The law of restitution, and in particular the principle of unjust enrichment, is an exception to this general rule. *See* C. Wonnell, *Replacing the Unitary Principle of Unjust Enrichment*, 45 Emory L.J. 153 (Winter 1996); N. McBride & P. McGrath, The *Nature of Restitution*, 15 Oxford J. Legal Stud. 33, 44–45 (1995).

Intellectual property law provides precedent for awarding both harm-based and benefits-based remedies. As set forth above, for example, a plaintiff may recover both damages under the Copyright Act to compensate him for his loss and profits to prevent the infringer from unfairly benefiting from his wrongful act. 17 U.S.C. § 504(b). Some courts and scholars urge a similar approach to the damages provisions of the Patent Act, *see Note, Unjust Enrichment for Patent Infringement: a Novel Idea?*, 4 J. Intell. Prop. L. 123 (Fall 1996); *c.f.*, E. Allan Farnsworth, *Your Loss or My Gain? The Dilemma of the Disgorgement Principle in Breach of Contract*, 94 Yale L.J. 1339 (1985) (eloquent discussion of the relative utility and nonutility of benefit-based approach to remedies in law of contracts), and the principle "straddles the line between the law of torts and restitution" as well. *Wonnell, supra*, at 167 (where defendant intentionally takes the property of another under circumstances in which one could have paid a competitive market price for the property, defendant is liable for harm caused unless the benefit received by defendant is greater, in which case defendant is liable for benefit). *See also Engel v. Engel*, 902 P.2d 442, 445 (Colo.App.1995) (where the benefit to defendant and loss to plaintiff do not coincide such that defendant has received benefit while plaintiff has suffered no loss, defendant must disgorge amount he has been enriched, citing Restatement of Restitution § 1, comment e).

However, fundamental to each of these remedial schemes is the principle that a plaintiff cannot recover twice for the same injury. In the copyright context, a plaintiff can only recover those profits of the infringer "not taken into account in computing the actual damages." 17 U.S.C. § 504(b). Similarly, a plaintiff should be entitled to the benefits gained through a defendant's misconduct only if those benefits are greater than the plaintiff's losses. In that case, it is well settled that the plaintiff can "waive the tort and sue in assumpsit" for the enrichment. *Wonnell, supra*, at 167–68.

While Plaintiffs in the instant case suggest the benefits to Cyanamid are greater than their loss, they have offered no evidence to support it. Rather, the evidence suggests Plaintiffs loss and Cyanamid's gain coincide: Plaintiffs were damaged in the amount of the reasonable royalty or licensing fee they should have received for their idea and Cyanamid benefitted in that same amount by not having to pay. Under these circumstances, there is no basis upon which to award Plaintiffs a share of Cyanamid's post-Patent profits over and above the 1981 value of the stolen idea.

## V. *CONCLUSION.*

I find Cyanamid liable to Plaintiffs under each of the two remaining claims for relief in this case. Cyanamid's fraud and concealment robbed Plaintiffs of their valuable idea and allowed Cyanamid to obtain profits and market advantages justice precludes it from retaining. However, because Plaintiffs' only attempt to quantify Cyanamid's profits was with the same evidence used to establish their actual damages for fraud, I decline to order disgorgement or otherwise award Plaintiffs a share of Cyanamid's post-Patent profits.

I find Cyanamid's conduct to have been attended by circumstances of fraud beyond a reasonable doubt such that Drs. Allen and Seligman are entitled to an award of punitive damages in a reasonable amount I have determined to be $500,000 each. Accordingly,

IT IS ORDERED that judgment shall enter in favor of Plaintiffs and against Cyanamid on Plaintiffs' claims for fraud and unjust enrichment in the amount of $44,396,159,

which is 12% of the aggregate actual and projected net sales of the reformulated Materna prenatal vitamin from the time of the fraud in 1981 through the life of the Patent, assuming an annual statutory interest rate of 8%.

IT IS FURTHER ORDERED that Cyanamid pay to Drs. Allen and Seligman $500,-000 each in punitive damages pursuant to Colo.Rev.Stat. § 13–21–102(1)(a).

IT IS FURTHER ORDERED that no damages are awarded to Plaintiffs for Cyanamid's copyright infringement.

IT IS FURTHER ORDERED that Plaintiffs shall have judgment for their costs herein expended.

## APPENDIX I

### 1982 - 2001 ACTUAL DAMAGES ASSUMING A REASONABLE ROYALTY RATE AS TESTIFIED TO BY EXPERT AND PROPER PATENT ENFORCEMENT AND MARKETING FOR LIFE OF PATENT

|  | NET SALES | ROYALTY FEES @ 12% | STATUTORY INTEREST @ 8% | PRESENT VALUE | CUMMULATIVE DAMAGE AMOUNT |
|---|---|---|---|---|---|
| 1982 | 9,000,000 | 1,080,000 |  |  | 1,080,000 |
| 1983 | 11,600,000 | 1,392,000 | 86,400 |  | 2,558,400 |
| 1984 | 11,200,000 | 1,344,000 | 204,672 |  | 4,107,072 |
| 1985 | 12,100,000 | 1,452,000 | 328,566 |  | 5,887,638 |
| 1986 | 11,900,000 | 1,428,000 | 471,011 |  | 7,786,649 |
| 1987 | 12,100,000 | 1,452,000 | 622,932 |  | 9,861,581 |
| 1988 | 13,700,000 | 1,644,000 | 788,926 |  | 12,294,507 |
| 1989 | 15,417,000 | 1,850,040 | 983,561 |  | 15,128,108 |
| 1990 | 15,800,000 | 1,896,000 | 1,210,249 |  | 18,234,356 |
| 1991 | 13,000,000 | 1,560,000 | 1,458,749 |  | 21,253,105 |
| 1992 | 13,001,000 | 1,560,120 | 1,700,248 |  | 24,513,473 |
| 1993 | 13,001,000 | 1,560,120 | 1,961,078 |  | 28,034,671 |
| 1994 | 13,001,000 | 1,560,120 | 2,242,774 |  | 31,837,565 |
| 1995 | 13,001,000 | 1,560,120 | 2,547,005 |  | 35,944,690 |
| 1996 | 13,001,000 | 1,560,120 |  | 1,514,680 | 37,459,370 |
| 1997 | 13,001,000 | 1,560,120 |  | 1,470,563 | 38,929,932 |
| 1998 | 13,001,000 | 1,560,120 |  | 1,427,731 | 40,929,932 |
| 1999 | 13,001,000 | 1,560,120 |  | 1,386,146 | 41,743,810 |
| 2000 | 13,001,000 | 1,560,120 |  | 1,345,773 | 43,089,583 |
| 2001 | 13,001,000 | 1,560,120 |  | 1,306,576 | 44,396,159 |